**CATHOLIC CHARITIES OF MAINE, INC., Plaintiff**

v.

**CITY OF PORTLAND, Defendant**

**No. CIV.03–55–P–H.**

United States District Court, D. Maine.

Feb. 6, 2004.

Gene R. Libby, Verrill & Dana, Kennebunk, ME, for Catholic Charities Maine Inc., Plaintiff.

Patricia A. Peard, Ronald W. Schneider, Jr., Bernstein, Shur, Sawyer, & Nelson, Portland, ME, for City of Portland.

## MEMORANDUM DECISION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

HORNBY, District Judge.

Are the health benefit plans of Catholic Charities Maine, Inc. "church plans" exempt from federal regulation under the Employee Retirement Income Security Act of 1974 and the Internal Revenue Code? If so, can Catholic Charities decline the exemption and subject itself to federal regulation? The answers are significant because they determine whether federal preemption defeats the City of Portland's effort to require Catholic Charities to extend its fringe benefits to the domestic partners of employees. Both parties have moved for summary judgment. I heard oral argument on January 22, 2004. For the reasons that follow I **GRANT** each party's motion in part.[1] Specifically, I conclude that Catholic Charities' plans are for the most part "church plans" and that Catholic Charities has effectively elected federal coverage as of July 22, 2003, thereby preempting application of Portland's ordinance to the greater part of its plans from that date forward. Until July 22, 2003, however, Catholic Charities' plans were exempt from ERISA and were fully subject to the City's ordinance. Application of the ordinance to the plans during that time was not unconstitutional. Finally, certain collateral fringe benefits (the

---

1. In reaching my decision, I did not rely upon any of the statements that the City of Portland challenges in its Motion to Strike (Docket Item 27). Therefore, the motion is **MOOT**.

Employee Assistance Program, bereavement leave, and leaves of absence) are not subject to ERISA preemption; the City's ordinance *does* govern them and may constitutionally do so. My decision has nothing to do with what is good or bad social policy, but only with whether local regulation is limited by federal statute or the United States or Maine Constitution.

## I. FACTS

On May 21, 2001, the City of Portland ("City") enacted Chapter 13.6, Sections 13.6–21, Domestic Partnership ("the Ordinance"). Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶ 10. The Ordinance required the City and the Portland School Committee to provide the same health and employment fringe benefits to employees with domestic partners [2] as to employees with spouses. *Id.* ¶ 11. On June 3, 2002, the City extended the reach of the Ordinance to any organization accepting Housing and Community Development ("HCD") funds from the City. *Id.* ¶ 14. Catholic Charities Maine, Inc. ("Catholic Charities") is one such organization.

Catholic Charities is a Maine non-profit corporation that provides a variety of social services to Maine residents. *Id.* ¶¶ 1–2. It is exempt from tax under section 501 of the Internal Revenue Code. Def.'s Statement of Material Facts ("Def.'s

SMF") ¶ 40. Catholic Charities is not a church, but it has close ties with the Roman Catholic Church in that it has membership, governing bodies, trustees and officers in common with the Roman Catholic Diocese of Portland, *id.* ¶ 42, and aims to implement the social teachings of the Catholic Church. *Id.* ¶ 41.

Catholic Charities provides a number of benefits to its employees, including retirement benefits, health benefits,[3] bereavement leave, an employee assistance program, and paid and unpaid leaves of absence. Am. Compl. ¶ 12; Def.'s Statement of Additional Facts ¶¶ 22–24. It extends benefits to families, Pl.'s SMF ¶ 4, but not to domestic partners of employees. *Id.* ¶ 16. Catholic Charities has filed the government documents that are required of ERISA plans since at least 1997. *Id.* ¶¶ 5–6.

The City awarded HCD funds for the period July 1, 2002 through June 30, 2003, to four of Catholic Charities' programs (Homemaker Services, Support and Recovery Services, St. Elizabeth's Child Development Center, and Family Child Care). Pl.'s SMF ¶ 15. Because Catholic Charities refused to sign a contract agreeing to comply with the Ordinance, however, the City did not disburse those funds. Pl.'s SMF ¶¶ 16–17. Catholic Charities never-

2. The Ordinance defines "domestic partner" as a person in a "domestic partnership." Code of Ordinances § 13.6–22(c). "Domestic partnership" is defined as:

[T]he entity formed by two persons who meet the following criteria and jointly file a registration statement proclaiming that: (1) They are in a relationship of mutual support, caring and commitment and intend to remain in such a relationship; and (2) They reside together within the city in a shared primary residence and have resided together and been domestic partners ... for a period of at least six (6) months prior to the date of registration; and (3) They are not

married; and (4) They are not related by blood closer than would bar marriage in the State of Maine; and (5) They are each other's sole domestic partner and intend to remain so indefinitely; and (6) They are competent to contract; and (7) They consider themselves a family ....
Code of Ordinances § 13.6–22(d).

3. Catholic Charities maintains two health benefit plans that are at issue in this case: the Employee Benefits Plan of Catholic Charities Maine and the Catholic Charities Maine Flexible Benefits Plan ["health benefit plans"]. Am. Compl. ¶ 12.

theless proceeded, at least in part, to carry out the service programs. Def.'s SMF ¶ 31. The City denied Catholic Charities' request for HCD funding for the period of July 2003 through June 2004. Pl.'s SMF ¶¶ 16–17.

On June 3, 2003, Catholic Charities filed an amended complaint against the City, seeking declaratory and injunctive relief as to its health benefit plans, and claiming that enforcement of the Ordinance is preempted by ERISA, 29 U.S.C. §§ 1001 et seq., and the Housing in Community Development Act and forbidden by the United States and Maine Constitutions. On July 22, 2003, Catholic Charities filed an election under the Internal Revenue Code Section 410(d), 26 U.S.C. § 410(d), for all of its plans, welfare and pension, stating its intent to be bound by federal law. Pl.'s Add'l SMF ¶ 183.

## II. ANALYSIS

### A. ERISA

The federal Employee Retirement Income Security Act of 1974 ("ERISA") contains a broad preemption provision. It directs that its coverage "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C. § 1144(a). Employee benefit plans include "welfare benefit plans" and "pension benefit plans." (Catholic Charities' pension benefit plan is not part of this dispute.) A "welfare benefit plan" includes, among other things, a plan to provide medical benefits. 29 U.S.C. § 1002(1)(A). Catholic Charities and the City agree that Catholic Charities' health benefit plans are "welfare benefit plans" under ERISA's definition. Def.'s Mot. at 3. They disagree, however, on whether Catholic Charities' health benefit plans are subject to ERISA's coverage: specifically, (a) whether they are exempt church plans; (b) if so, whether they have

effectively elected out of the exemption; and (c) whether the City's Ordinance even "relates to" employee benefit plans.

### (1) Are Catholic Charities' employee benefit plans exempt from ERISA as "church plans"?

Title I of ERISA applies to employee benefit plans, both welfare and pension, with a few enumerated exceptions. 29 U.S.C. § 1003. One of those exceptions is for a "church plan ... with respect to which no election has been made under section 410(d) of [the Internal Revenue Code]." Id. § 1003(b)(2). "Church plan" is defined in section 1002(33) as "a plan established and maintained ... for its employees ... by a church or by a convention or association of churches which is exempt from tax under section 501 of [the Internal Revenue Code]."

The City does not contend that Catholic Charities is a church or convention or association of churches. It relies instead on an ERISA provision that expands the general definition of "church plan" to encompass, in certain circumstances, plans established and maintained by non-church organizations. Specifically, ERISA provides that a person is an "employee of a church or a convention or association of churches" if the person is "an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of [the Internal Revenue Code] and which is controlled by or associated with a church or a convention or association of churches." 29 U.S.C. § 1002(33)(C)(ii). Catholic Charities is indisputably tax-exempt under section 501; the issue is whether it is also "controlled by" or "associated with" a church. If so, the church (here, the Roman Catholic Church) "shall be deemed the employer of any individual included as an

employee under clause (ii)." Section 1002(33)(C)(iii). Thus, ERISA brings a plan established or maintained by a non-church organization within the general definition of "church plan" if that organization is "controlled by" or "associated with" a church. *See Lown v. Continental Cas. Co.,* 238 F.3d 543, 547 (4th Cir.2001); Peter J. Wiedenbeck, *ERISA's Curious Coverage,* 76 Wash. U.L.Q. 311, 348 (1998) ("An employee of a tax-exempt organization is treated as the employee of a church and his employer is deemed to be a church if the organization is 'controlled by or associated with a church or convention or association of churches.' ").

■ ERISA does not define "controlled by." Courts have interpreted the provision as referring to corporate control, such as church control over appointment of a majority of the non-church organization's officers or Board of Directors. *See Lown,* 238 F.3d at 547; *Duckett v. Blue Cross & Blue Shield,* 75 F.Supp.2d 1310, 1316 (M.D.Ala.1999). *See also* 26 C.F.R. § 1.414(e)–1(d)(2) (providing that "an organization, a majority of whose officers or directors are appointed by a church's governing board or by officials of a church, is controlled by a church" for the purposes of the Code). Under Catholic Charities' bylaws, the President and Vice President of the Catholic Charities Board of Directors are always the Diocesan Bishop of Portland and the Vicar General, respectively. Def.'s SMF ¶¶ 48–51. As President, the Bishop has the power to appoint and to remove both the corporation's members, *id.* ¶ 46, and the Chief Executive Officer. *Id.* ¶ 55. The corporation's members, in turn, vote to approve members of the Board of Directors. *Id.* ¶ 47. Thus, the Bishop of Portland essentially controls the Board of Directors. Moreover, Catholic Charities cannot sell any of its property or assets without the Bishop's approval. *Id.*

¶ 59. These undisputed facts certainly suggest that Catholic Charities is "controlled by" the Catholic Church. But ultimately I do not need to decide the control question, because Catholic Charities is indisputably "associated with" the Church.

According to ERISA, an organization is "associated with" a church "if it shares common religious bonds and convictions with that church ...." Section 1002(33)(C)(iv). While there is nothing in the record to suggest that Catholic Charities imposes a denominational requirement on its employees or those who receive its services, Catholic Charities states that it provides services "based on Roman Catholic religious teaching that calls on Catholics to serve those in need" and considers "its work a vital part of the ministry of the Roman Catholic Church to the people of the State of Maine." Am. Compl. ¶ 7. Catholic Charities' Mission Statement declares that it is "an organization of the Diocese of Portland that implements the social teachings of Jesus Christ as taught by the Catholic Church." Def.'s SMF ¶ 41. The Diocese of Portland provides financial assistance to Catholic Charities on an annual basis, *id.* ¶ 61, and Catholic Charities is listed in *The Official Catholic Directory Anno Domini,* an annual Catholic directory. *Id.* ¶ 60. These undisputed facts show that Catholic Charities shares common religious bonds and convictions with the Roman Catholic Church and is, therefore, "associated with" the Church. *Compare Lown,* 238 F.3d at 548 (determining "association" by assessing whether the church plays any official role in the governance of the organization; whether the church provides assistance to the organization; and whether a denominational requirement exists for any employee or customer/client of the organization); Department of Labor Opinions 96–19A, 95–30A, and 95–12A (all assessing "bonds and convictions" by looking at factors that assure the organization adheres to the tenets

and teachings of the church, including whether the organization is listed in a religious directory and whether the church plays a role in the organization's governance). Catholic Charities' lawyer conceded as much at oral argument.

■ For ERISA purposes, therefore, I conclude that Catholic Charities' employees are considered employees of the Roman Catholic Church and the health benefit plans are treated as established and maintained by the Church for its employees. Accordingly, the health benefit plans are "church plans" under ERISA[4] and eligible to be exempt from its coverage.

### (2) Did Catholic Charities' section 410(d) election bring its health benefit plans within ERISA's coverage?

The ERISA church plan exemption is limited to "a church plan ... with respect to which no election has been made under section 410(d) of [the Internal Revenue Code]." 29 U.S.C. § 1003(b)(2). Section 410(d) of the Internal Revenue Code ("the Code") provides that if a "church ... which maintains any church plan makes an election under this subsection ..., then the provisions of this title relating to participation, vesting, funding, etc. ... shall apply to such church plan as if such provisions did not contain an exclusion for church plans." The Code's definition of "church plan," at section 414(e), is virtually identical to ERISA's.[5] Catholic Charities made the section 410(d) election for all its plans, including its health plans, in July 2003. The City argues that because the specific Code provisions applicable to electing church plans (participation, vesting, and funding) relate only to pension benefit plans, welfare benefit plans like those of

---

4. ERISA provides that the term "church plan" also includes "a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, if such organization is controlled by or associated with a church ...." Section 1002(33)(C)(i). It is undisputed that Catholic Charities' plans do not satisfy these criteria. Catholic Charities reads this provision as limiting the non-church entities that may be considered to have church plans and argues that its plans may therefore not be considered "church plans." Pl.'s Opp'n Mot. at 3–5. I am not persuaded. By its terms, this provision is an alternative means of satisfying the "church plan" definition, and does not restrict the definition, whose language quoted in text, albeit circuitous, clearly covers Catholic Charities' plans. The provision was likely included simply to ensure that any third party administrator of a church plan was included within the church plan exemption. *See Friend v. Ancillia Systems Inc.*, 68 F.Supp.2d 969, 973 (N.D.Ill.1999) ("section 1002(33)(C)(i) does not 'require' that the plan be maintained by an organization the principle purpose of which is administering or funding the plan.

The statute merely 'includes' such plans in the definition of church plan.... [The intent of (C)(i)] is to require that if an organization controlled by or associated with a church wants to hire an administrator for its plan, the administrator must also be controlled by or associated with the church."); Peter J. Wiedenbeck, *ERISA's Curious Coverage,* Wash. Univ. L.Q. 311, n. 178 (1998) ("Where the plan is set up by the church-related charity for its employees, the expansive definitions of 'church' and 'church employee' seem to assure that the plan is 'established and maintained' by a (deemed) church for its employees. But church control or influence (direct or indirect) over the board or committee that administers the plan also satisfies the definition. Some rulings explicitly treat the latter requirement as an alternative means of satisfying the church plan definition."); Department of Labor opinions, 94–11A; 95–10A; 90–12A (all treating section 1002(33)(C)(i) as an alternative means of meeting the definition).

5. The Code's definition of "church plan" contains an additional subsection, providing special rules for chaplains and self-employed ministers. 26 U.S.C. § 414(e)(5). The additional rules are not relevant to this case.

Catholic Charities cannot make the section 410(d) election. Def.'s Mot. at 6–7. According to the City, only church *pension* plans may voluntarily elect to be subject to federal regulation; church *welfare* plans have no means of opting in.

As enacted in 1974, ERISA provided that its Title I applied to any "employee benefit plan," 29 U.S.C. § 1003(a), except (for our purposes) a non-electing "church plan," *id.* § 1003(b)(2). The ERISA definitions of both "employee benefit plan" and "church plan" encompass welfare benefit plans. *Id.* § 1002(3), (33). However, these definitions appear in Title I of ERISA, and do not directly apply to the Internal Revenue Code. As enacted in 1974, Title II of ERISA contained the Code amendments and was captioned "Amendments to the Internal Revenue Code Relating to *Retirement* Plans," (emphasis added). While this caption suggests that the 1974 Code amendments dealt only with pension plans, nothing in the Code itself expressly limits the definition of "plan" or "church plan" to pension plans. To the contrary, the Code definition of "church plan" actually refers to "welfare plans." [6]

The Treasury regulations confirm that church plans for which a section 410(d) election is made become subject to Title I of ERISA in addition to Internal Revenue Code provisions. 26 C.F.R. § 1.10(d)–1. Since there are several provisions in Title I of ERISA that affect welfare benefit plans, election by church welfare plans is not an empty exercise. For example, Title I of ERISA subjects both pension and welfare plans to duties of disclosure and reporting, 29 U.S.C. § 1021, and mandates that all plans be established and maintained in a written instrument with a named fiduciary. *Id.* § 1102. ERISA also contains mandates that affect only welfare plans, including a provision regarding continuation coverage, *id.* § 1161, and parity in mental health benefits. *Id.* § 1185a. All of these are statutory provisions that, without a section 410(d) election, a welfare benefit church plan would escape. *See* Alison M. Sulentic, *What Catholic Social Teaching Says to Catholic Sponsors of Church Plans*, 17 J. Contemp. Health L. & Pol'y 1, 44–45, 48 (2000) (noting that, although the difference "between church welfare plans that become subject to ERISA and non-electing church welfare plans is not quite as stark" as for church pension plans, there are some ERISA mandates to which an electing welfare plan becomes subject).

Admittedly, the provisions of the Internal Revenue Code explicitly listed in section 410(d) (participation, vesting, and funding) affect only pension benefit plans. But this list is followed by an enigmatic "etc." And there are several other provisions of the Code that affect welfare benefit plans and exempt church plans, demonstrating that the "church plan" label has significance for welfare plans.[7] At worst,

---

6. 26 U.S.C. § 414(e)(3)(A) provides that "[a] plan established and maintained for its employees ... by a church ... includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both ...."

7. Section 4980B, for example, imposes continuation coverage requirements on group health plans with a tax on plans that fail to comply. Church plans, within the meaning of section 414(e), however, are exempt from the tax. Section 4980D imposes a tax on the failure of any group health plan to comply with the group health plan requirements of chapter 100, but exempts church plans as defined in section 414(e).

The City points out that, unlike the sections exempting church pension plans, those sections exempting church welfare plans (*e.g.,*

the Code is ambiguous on whether welfare plans may make a section 410(d) election.[8] What is apparent from the text and legislative history of ERISA is that the law was enacted in the context of pension reform.[9] That is where Congress gave nearly all its energy and attention. There is almost no discussion in the Committee Reports of welfare plans; they appear to have been just lumped in. So, when Congress decided both to exempt church plans (presumably because of constitutional concerns), and to let them voluntarily elect federal coverage (presumably because Congress realized that some church plans would want to compete for their employees' good will and/or would prefer uniform national regulation), it seems likely that the drafters simply never consciously thought about whether welfare plans should be included or excluded. There is certainly no suggestion anywhere that Congress intended church plan treatment to be different for pension plans than for welfare plans.

The parties agree that there are no controlling decisions on the availability of the election for welfare plans. Both parties also point to various sources that they believe support their reading of the statute. Catholic Charities cites three cases for the proposition that the 410(d) election is available to church welfare plans. Pl.'s Opp'n Mem. at n. 7 (citing *Duckett v. Blue Cross & Blue Shield of Alabama,* 75 F.Supp.2d 1310, 1316 (D.Ala.1999); *Jones v. Kaiser Foundation,* 1992 WL 52522, *1, 1992 U.S. Dist. LEXIS 2023 at *3 (D.D.C., Feb. 26, 1992); *Am. Ass'n of Christian Sch. Voluntary Employees Beneficiary Ass'n Welfare Plan Trust v. United States,* 850 F.2d 1510, 1517 (11th Cir.1988)). Each of these cases contains a sentence of dictum noting the availability of the election, but, because the question whether a welfare plan could elect was not before the courts, the opinions lack reasoning or analysis.

sections 4980B and 4980D) do not qualify the exemption by referring to the election. Def.'s Supplemental Mem. at 2. For example, section 411 of the Code, dealing with minimum vesting standards, exempts a church plan "(within the meaning of section 414(e)) with respect to which the election provided by section 410(d) has not been made." Section 4980B, dealing with continuation coverage, exempts a church plan "within the meaning of 414(e)" and does not reference the election. But section 410(d) provides a non-exhaustive list of provisions of the Code that become applicable upon making the election. If sections 4980B and 4980D are among the provisions that apply when a church plan elects (captured by the "etc."), then it does not matter whether those sections expressly reference the election. In addition, sections 4980B and 4980D were added to the Code in 1988 and 1996, respectively. Pub.L. 100–647; Pub.L. 104–191. Unlike the participation, vesting, and funding standards, they were not brought into the Code as part of ERISA. The difference in timing may explain the difference in language.

8. Treasury has also given some context to the "etc." but apparently only for pension plans.

Treasury regulations provide that, in addition to those provisions listed in section 410(d), Code provisions relating to prohibited transactions and certain miscellaneous provisions relating to annuities, mergers and consolidations, assignment and alienation, benefit commencement, social security increases, and employee contribution withdrawals apply to electing church plans. 26 C.F.R. § 1.10(d)–1.

9. A few years prior to the enactment of ERISA, the Subcommittee on Labor of the Committee on Labor and Public Welfare conducted a study on the activities of private welfare and pension plans. In its report on that study, the Subcommittee noted the following: "Most employee benefit plans are classified in 'welfare' or 'pension' categories. Early in the course of the study, it became apparent that to achieve the basic objective of Senate Resolution 35 the major effort should be directed to the problems of pension plans as distinguished from welfare plans." Interim Report of Activities of the Private Welfare and Pension Plan Study, 1971, 92d Congress, 2d Session, Report No. 92–624.

■ The City cites several Department of Labor opinion letters, one of which states that it is the Department's position that the section 410(d) election is available only to pension plans. *See* Dep't of Labor, Advisory Letter No. 95–07A. Because opinion letters do not result from formal adjudications or notice-and-comment rulemaking, they do not receive the typical level of deference. *See Christensen v. Harris County*, 529 U.S. 576, 586, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). The statements contained in the Department of Labor opinions are not supported by reasoning or analysis; nor were they central to the agency's decisions. I do not find them persuasive. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

■ Under *Chevron,* I must defer to an administrative interpretation when a statute is ambiguous and Congress has, explicitly or implicitly, delegated authority to the agency. *Chevron v. Natural Resources Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* deference is appropriate here insofar as the Treasury has promulgated regulations dealing with *the form and manner* for making a section 410(d) election, because section 410(d) of the Code expressly gives the Treasury the authority to decide the form and manner of the election. The regulation adopted by the Treasury provides that a church plan may elect by attaching a statement to the annual return required under section 6058(a) or by requesting a determination letter relating to the qualification of the plan under sections 401(a), 403(a), or 405(a) of the Code. 26 C.F.R. § 1.10(d)-(1)(c)(3). Catholic Charities maintains that it satisfied the first alternative by making its election on a Form 5500. The City points out that the section 6058(a) return is required only of employers maintaining "a pension, annuity, stock bonus, profit-sharing, or other funded plan of deferred compensation." But the annual return form required by section 6058 is Form 5500 and it is the same form required for a welfare plan under certain provisions of ERISA.[10] By attaching its election to Form 5500, Catholic Charities technically has complied with the form and manner requirement and has elected to have ERISA apply to all of its employee benefit plans, including its health plans. Moreover, although Congress charged the Treasury with the task of promulgating *form and manner* regulations, Congress did not authorize the Treasury to regulate what *kinds* of plans may elect. If 26 C.F.R. § 1.10(d)-(1)(c)(3) contains form and manner requirements only for church pension plans, then the Treasury simply has neglected or declined to provide a form and manner requirement for church welfare plans. There being no regulation governing a church welfare plan's election, a church welfare plan would be entitled to elect in any reasonable form and manner, including by attaching a statement to form 5500.[11]

10. The top of form 5500 provides that the form is required under sections 104 and 4065 of ERISA. These provisions both apply to welfare plans. 29 U.S.C. §§ 1024, 1365.

11. The City points to two agency publications suggesting that only church pension plans may elect by filing a Form 5500. The instructions accompanying Form 5500 provide that the following plans should not file the form: a church pension plan "not electing coverage under Code section 410(d)" and a church welfare plan "under ERISA section 3(33)." The instructions (and the form) were amended in 1999. Prior to 1999, the instructions provided that filing was required of any "employee benefit plan subject to ERISA." 1998, Instructions to Form 5500, at 2. The Federal Register does not explain why the language was changed. In addition, a Department of Labor publication entitled "In Brief: 1999 Form 5500" includes on a list of employee benefit plans that are exempt from the annual

The City has not advanced, and I have been unable to determine, a reason that Congress would choose to permit church pension plans, but not church welfare plans, to elect ERISA coverage.[12] The ERISA policies all run to the contrary. In enacting ERISA, Congress intended to ensure that plans and plan sponsors would be subject to a uniform body of employee benefits law. "The goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government ..., [and to prevent] the potential for conflict in substantive law ...." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). *See also Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 8–11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987) (discussing ERISA's policy of uniformity). If only church pension plans are permitted to elect coverage, these goals of uniformity and burden reduction are undermined. An organization like Catholic Charities, which maintains separate pension and welfare plans, would have to comply with ERISA for its pension plans, but would have to comply with state law and local law for its welfare plans. Here, for example, Catholic Charities would be forced to look to the ordinances of each town in which its employees are located for pertinent law.

For the foregoing reasons, I conclude that the most reasonable interpretation of the federal statute is that a church welfare benefit plan can make a section 410(d)

election. When Catholic Charities made the section 410(d) election on July 22, 2003, its welfare benefit plans became subject to Title I of ERISA.

### (3) Does the Ordinance "relate to" Catholic Charities' plans?

Since ERISA "shall supercede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ..." subject to the Act, 29 U.S.C. § 1144(a), the remaining question is whether the City's Ordinance is a state law that "relates to" an employee benefit plan. The answer to this question is significant because it affects all HCD fund recipients, not just those with church plans who have elected under section 410(d). If the Ordinance is preempted, then it does not bind any HCD fund recipient maintaining an ERISA-covered plan. The parties agree that the City's Ordinance is a "state law" for ERISA purposes, but disagree about whether it "relates to" ERISA plans.

The Supreme Court has held that a state law requiring employers to pay employees specific benefits "relates to" an ERISA plan and is, therefore, preempted. *Shaw v. Delta Air Lines,* 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). In *Shaw,* the Court considered whether a state law prohibiting employers from structuring their plans in a manner that discriminated on the basis of pregnancy "related" to the plans. *Id.* The Court stated that "[a] law 'relates to' an employee benefit plan, in the normal sense of the

reporting requirements "[c]hurch pension plans not electing coverage under Code § 410(d) and all church welfare plans." Unlike statutes, regulations, or judicial decisions, these publications merely provide guidance and do not have the force of law. *See Roberts v. United States,* 734 F.Supp. 314 (N.D.Ill. 1990); T.C. Mem.1988–331, Docket No. 2684–87. They are not, therefore, entitled to *Chevron* deference. *Christensen v. Harris*

*County,* 529 U.S. 576, 586, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

**12.** Moreover, an organization with a plan that is both pension and welfare, which ERISA explicitly permits, 29 U.S.C. § 1002(3), could take advantage of the election and opt for preemption, an anomalous result if welfare plans are excluded.

phrase, if it has a connection with or reference to such a plan." *Id.* Given this broad definition, the Court had "no difficulty" in concluding that the state law there was preempted by ERISA. *Id.* at 98–100, 103 S.Ct. 2890.

Since *Shaw*, the Supreme Court has made clear that there are two ways in which a state law may be found to "relate to" an ERISA plan. The law will be preempted if it,either (1) has a connection with or (2) a reference to an ERISA plan. *E.g., New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). Catholic Charities concedes that the City's Ordinance does not "reference" the plans in a manner contemplated by the second alternative, but argues that the Ordinance has an impermissible "connection" with its ERISA plans under the first alternative. Pl.'s Mot. at n. 4.[13]

The Supreme Court has also narrowed its reading of the ERISA preemption provision since *Shaw*, emphasizing that neither "infinite relations" nor "infinite connections" can be the measure of preemption. *New York State Conf. of Blue Cross & Blue Shield Plans, et al. v. Travelers Ins. Co.*, 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). To determine whether a state law has an impermissible connection with ERISA plans, a court must now look to ERISA's objectives "as a guide to the scope of the state law that Congress understood would survive." *Id.* "The basic thrust of the pre-emption clause ... was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Id.* at 657, 115 S.Ct. 1671. In *Travelers*, the Court held that ERISA did not preempt a state law requiring hospitals to collect surcharges from patients covered by a commercial insurer, but not from patients insured by a Blue Cross / Blue Shield plan. *Travelers*, 514 U.S. at 659–60, 115 S.Ct. 1671. Several commercial insurers challenged the law as preempted by ERISA because it created an economic incentive for insurance buyers, including ERISA plans, to avoid commercial insurers and to favor Blue Cross/Blue Shield. The Court distinguished the New York law from *Shaw*, however, reasoning that it did not operate to bind plan administrators to a particular choice and had only an indirect economic effect on the choices made by ERISA plans. *Id.* Because the law did not attempt to regulate the content or administration of ERISA plans, it did not conflict with Congress's goal of providing a uniform administration of employee benefit plans.

*Travelers* represented a retreat from the broadest reading once given "relate to." It did not, however, overrule *Shaw*. In *Travelers* and since, the Court has reiterated that ERISA preempts state laws that "mandate[ ] employee benefit structures or their administration." *Id.* at 658, 115 S.Ct. 1671; *Egelhoff v. Egelhoff*, 532 U.S. 141, 147–49, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001). In 2001, the Supreme

---

**13.** After acknowledging in its motion for summary judgment that the Ordinance does not "reference" ERISA plans, Catholic Charities briefly argues in its opposition motion that the Ordinance does reference such plans. Opp'n Mot. at 9–10. The cases hold that, in order for a state law to be preempted because it impermissibly "references" ERISA plans, the law must act immediately and exclusively on ERISA plans or the existence of ERISA plans must be essential to the law's operation. *E.g., Carpenters Local Union No. 26 v. United States Fidelity & Guaranty Co.*, 215 F.3d 136, 143 (1st Cir.2000). This Ordinance is indifferent to whether the health plans of organizations receiving HCD funds are ERISA plans. Therefore, it is not preempted on the basis of an impermissible reference.

Court considered a Washington statute that directed that the designation of a spouse as beneficiary (of a nonprobate asset) be revoked automatically upon divorce. *Egelhoff*, 532 U.S. at 148, 121 S.Ct. 1322. The Court stated that the law required administrators to "pay benefits to the beneficiaries chosen by state law, rather than to those identified in plan documents" and thereby "implicate[d] an area of core ERISA concern." *Id.* at 147, 121 S.Ct. 1322. Moreover, the Court reasoned, the law interfered with ERISA's goal of nationally uniform plan administration by requiring plan administrators to look to state laws before disbursing benefits. *Id.* at 148, 121 S.Ct. 1322. Because the Washington law attempted to regulate ERISA plans' benefit structures and administration, the Court held that it had a "connection with" ERISA plans and was preempted.

■ Portland's Ordinance demands that certain employers change their plans and offer coverage to domestic partners. Thus, like the state laws at issue in *Shaw* and *Egelhoff* (and unlike the law in *Travelers* ), the Ordinance is concerned with the substantive content and administration of employee benefit plans, an area of core ERISA concern. Given the foregoing Supreme Court precedent, it is clear that if the Ordinance demanded that all employers in the City offer domestic partner coverage, it would be preempted. The only real question is whether the City Ordinance escapes *Shaw* and *Egelhoff* because it is not an outright mandate to employers, but rather conditions receipt of HCD funds upon employers offering domestic partner coverage. The City stresses that as long as Catholic Charities is willing to forgo HCD funding, it may continue to deny domestic partners coverage. None of the cases, however, imposes a requirement that a state law act directly on an ERISA plan in order to be preempted. In fact, *Travelers* expressly acknowledged "that a state law might produce such acute, albeit indirect, economic effects, by intent or otherwise, as to force an ERISA plan to adopt a certain scheme of substantive coverage . . . and that such a state law might indeed be pre-empted" by ERISA. *New York State Conf. of Blue Cross & Blue Shield, et al. v. Travelers Ins. Co.,* 514 U.S. 645, 668, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).

An ordinance very similar to the City of Portland's was at issue in *Air Transport Ass'n of Am. v. City and County of San Francisco,* 992 F.Supp. 1149 (N.D.Cal. 1998). In that case, Judge Wilkins considered a San Francisco ordinance that prohibited the city from contracting with companies not offering domestic partner coverage. *Id.* at 1155. Because the San Francisco ordinance effectively forced contractors to modify their ERISA plans, she held that ERISA preempted the ordinance. *Id.* at 1176.

The employers in *Air Transport* could have avoided the reach of the ordinance by not contracting with the City; and Catholic Charities could avoid the Portland Ordinance by giving up HCD funds. But none of the Supreme Court cases suggests that a state law is saved from preemption just because its mandate is conditional. Even though "conditional," both the San Francisco ordinance and the Portland Ordinance undermine Congress's goal of shielding benefit plans from inconsistent regulation. Because the Ordinance aims to expand the substantive coverage of HCD-recipients' ERISA plans, it resembles the state laws in *Shaw* and *Egelhoff.* The Ordinance has an impermissible connection with Catholic Charities' ERISA plans and became preempted when Catho-

lic Charities made a section 410(d) election on July 22, 2003.[14]

### (4) Other Benefits

Catholic Charities acknowledges that it provides its employees certain benefits that are not covered by ERISA. Pl.'s Reply to Def.'s Opp'n Mot. at 7. Specifically, Catholic Charities has a self-funded employee assistance program and offers bereavement benefits and paid and unpaid leaves of absence to its employees. Pl.'s Resp. to Def.'s Additional SMF ¶¶ 22–24. The Ordinance is not preempted with respect to benefits offered by Catholic Charities that are not welfare or pension benefit plans covered by ERISA.

### B. HCDA

██ Catholic Charities also claims that the Portland Ordinance is preempted by the Housing and Community Development Act, 42 U.S.C. § 5301 *et seq.*, ("HCDA"), which specifies the purposes for which HCD funds may be used. The First Circuit has held, however, that the HCDA does not provide a private right of action. *Latino Unidos De Chelsea En Accion v. Sec. of Housing & Urban Dev.*, 799 F.2d 774, 794 (1st Cir.1986). Catholic Charities argues, in its opposition memorandum and at oral argument, that it is nonetheless entitled to a declaratory judgment on the question of HCDA preemption. Pl.'s Opp'n Mem. at 21–22.

██ The essence of Catholic Charities' preemption argument is that the City is using HCD funds in a manner not authorized by the language or policy of the HCDA. But as the First Circuit has recognized, the HCDA specifically provides for exclusive enforcement by the Secretary of Housing and Urban Development. *Latinos Unidos De Chelsea En Accion*, 799 F.2d at 794. "The Declaratory Judgment Act cannot be used to circumvent the enforcement mechanism which Congress established." *Williams v. Nat'l Sch. of Health Tech.*, 836 F.Supp. 273, 281 (E.D.Pa.1993). In this case, a declaratory judgment action using the HCDA as the source of the underlying substantive law is tantamount to a private cause of action, *see id.*, forbidden by the First Circuit. The City is entitled to summary judgment on this claim.

### III. CONSTITUTIONAL ISSUES

The remaining question is whether the Ordinance can constitutionally apply to Catholic Charities' non-ERISA plans and whether the Ordinance can constitutionally apply to Catholic Charities' ERISA plans during the time before it elected federal coverage.

### A. Equal Protection

██ Catholic Charities alleges that the City has violated its rights under the

---

**14.** I have issued an opinion in another case, *New Hampshire Motor Transport Ass'n, et al. v. Rowe*, Case No. 1:03cv178, concluding that the Federal Aviation Administration Authorization Act ("FAAAA"), 49 U.S.C. § 14501, does not preempt a state law regulating tobacco delivery sales. The FAAAA and ERISA employ the same language in their preemption provisions ("relate to"). ERISA's preemption provision once received an expansive interpretation, and Congress explicitly adopted that interpretation when it drafted the FAAAA preemption provision. Because the Supreme Court has interpreted ERISA's provision more strictly in recent years, however, ERISA's preemption provision is now arguably narrower than the FAAAA's. Still, there is no inconsistency in finding preemption under ERISA and no preemption under the FAAAA. The Portland ordinance is exactly the type of local regulation that the Supreme Court has insisted ERISA preempts, while the state law in *New Hampshire Motor Transport* deals with an area that states' have traditionally regulated, triggering a presumption against preemption.

equal protection clause of the Fourteenth Amendment. The equal protection clause of the Fourteenth Amendment directs that similarly situated persons or groups be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The general rule is that laws are presumed valid and will be sustained under the equal protection clause if they are rationally related to a legitimate state interest. *Id.* Only laws that classify on the basis of race, alienage, national origin, or gender (so-called "suspect" or "quasi-suspect" classes) are subject to a higher standard of review. *Id.*

Catholic Charities alleges in its complaint that "it is similarly situated with other organizations which receive funds through contracts with the City." Am. Compl. ¶ 46. It also alleges that it "is being treated differently" from these similarly situated contractors because it is being forced to offer domestic partner benefits and the other contractors are not. *Id.* at ¶ 47. But HCD-fund recipients are not a suspect or quasi-suspect class; the Ordinance passes constitutional muster as long as it is rationally related to a legitimate interest. The City's interest in increasing the number of residents covered by health insurance is legitimate, and the Ordinance is a rational means of achieving the City's goal.

Catholic Charities' complaint also alleges that "[o]ther contractors, which are not subject to the Ordinance, are not affiliated with religious organizations." *Id.* at ¶ 48. Thus, Catholic Charities suggests that it is being discriminated against vis-à-vis non-religiously affiliated contractors. But the Ordinance is facially neutral; it applies to all HCD fund recipients and does not draw a line on the basis of religion. There is no indication in the record that there is a discriminatory purpose behind the Ordinance. Nor does the record suggest that religious groups are disproportionately affected by it. Catholic Charities has not established an equal protection violation and the City is entitled to summary judgment on this claim.

## B. First Amendment

### (1) Free Exercise

Catholic Charities also claims that the Ordinance violates its First Amendment right to the free exercise of religion. The free exercise inquiry asks "whether government has placed a substantial burden on the observation of a central belief or practice." *Strout v. Albanese*, 178 F.3d 57, 65 (1st Cir.1999) (quoting *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). Neutral laws of general applicability are constitutional, even if they incidentally burden religious beliefs or practices. *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 878–79, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

Catholic Charities argues that, in order to comply with the Ordinance, it will be forced to violate its sincerely held religious beliefs. Am. Compl. ¶ 58. But religious beliefs do not excuse a group from complying with an otherwise valid, generally applicable, and neutral law. *See Hennessy v. City of Melrose*, 194 F.3d 237, n. 1 (1st Cir.1999). The Ordinance is neutral and generally applicable; it applies to all recipients of HCD funds regardless of whether they are religiously affiliated. Moreover, there is nothing in the record to suggest that Catholic Charities' religious beliefs have been substantially burdened. Catholic Charities did, after all, decline to follow the Ordinance and was able to provide the service programs without the benefit of HCD funds. The Ordinance does

not violate Catholic Charities' rights under the free exercise clause of the United States Constitution.

### *(2) Free Speech*

 In Count V, Catholic Charities claims that the Ordinance also violates its right to free speech under the First Amendment. The initial step in the free speech inquiry is to assess whether the proscribed conduct is sufficiently communicative to qualify as expression protected by the First Amendment. *Gun Owners' Action League v. Swift*, 284 F.3d 198, 210 (1st Cir.2002). Conduct constitutes protected expression if "it evinces an intent to convey a particularized message ... and the likelihood is great that the message would be understood by those [to whom it is addressed]." *Id.* at 211 (quoting *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)).

 Catholic Charities claims that, by not providing domestic partners benefits, it sends a message about Roman Catholic teaching on non-family relationships. Am. Compl. ¶ 62. Catholic Charities may intend to send this message through its benefit plans; but not all conduct intended to express an idea can be labeled "speech." *U.S. v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Although employee benefit plans serve many functions, expressing ideological points of view is not one of them. There simply is no "particularized message" in the provision of employee benefits, let alone a message that would be understood by the public. *Compare Troster v. Penn. State Dep't of Corrections*, 65 F.3d 1086, 1091 (3d Cir.1995) (holding that the wearing of a flag patch on a uniform is not "demonstrative of an attitude or belief").

Nor does the Ordinance compel Catholic Charities to endorse any particular message. The Ordinance does not force Catholic Charities to say anything and it does not impose any restriction on Catholic Charities' speech or conduct disclaiming endorsement of non-family relationships. *See Forum For Academic & Inst. Rights, Inc. v. Rumsfeld*, 291 F.Supp.2d 269, 305 (D.N.J.2003). Providing benefits to domestic partners does not represent an endorsement of non-family relationships any more than providing benefits to unmarried pregnant women represents an endorsement of single parenthood. Def.'s SMF ¶ 25. The provision of employee benefits is not imbued with sufficient elements of communication to qualify it for First Amendment protection.

### *(3) Unconstitutional Condition*

 In its opposition motion, Catholic Charities clarifies that its equal protection and First Amendment claims are grounded in the doctrine of unconstitutional conditions. Pl.'s Opp'n Mem. at 13. The doctrine of unconstitutional conditions generally provides that the government may not condition the receipt of a benefit upon a person giving up his, her or its constitutional right. *Philip Morris v. Reilly*, 312 F.3d 24, 46 (1st Cir.2002). When the benefit is discretionary, the condition attached to receipt of the benefit must bear some connection to the rationale the government would employ in denying the benefit outright. *See id.; Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987). Catholic Charities argues that the City has unconstitutionally conditioned receipt of HCD funds on the granting of domestic partner health benefits. In order for a condition to be unconstitutional, however, it must implicate a constitutional right. I have already concluded that Catholic Charities does not have a constitutional right to administer its employee benefit

plans in the manner it chooses. The City's condition on HCD funding is not, therefore, unconstitutional.

### C. Maine Constitution

 Catholic Charities also alleges that the Ordinance violates the free exercise clause of the Maine Constitution. Maine Const. art. I, § 3. Maine's free exercise clause is worded differently and the Law Court has not expressly adopted the United States Supreme Court's approach to the free exercise inquiry. *See Rupert v. City of Portland,* 605 A.2d 63, 66 n. 3 (Me.1992) ("We have no reason in this case to decide whether we in applying the Maine Free Exercise Clause will change course to follow the Supreme Court's lead in *Smith.").* In *Bagley v. Raymond School Dep't,* 728 A.2d 127, 132 (Me.1999), the parties did not contend that Maine's free exercise clause gave any greater protection than the United States Constitution, and the Court therefore proceeded "with the understanding that the rights guaranteed by the United States Constitution and the Maine Constitution are coextensive." *Id.* Catholic Charities has not argued that the Maine Constitution affords greater protections than its federal counterpart. Therefore, I will assume for the purposes of this decision that the rights guaranteed by the United States and Maine Constitution are co-extensive. For the reasons set forth in the federal free exercise section of this opinion, I conclude that the Ordinance does not violate the Maine Constitution.

### IV. CONCLUSION

The City of Portland's goal of expanding the number of residents receiving health benefits may be worthy; but federal law does not permit states or municipalities to regulate the content of employee benefit plans that are covered by ERISA. Therefore, Catholic Charities' motion for summary judgment and request for declaratory relief on Count I of its Amended Complaint is GRANTED in part. I declare that, since July 22, 2003, when Catholic Charities made the section 410(d) election, ERISA has preempted the Ordinance's application to Catholic Charities' ERISA health benefit plans. The City's motion for summary judgment on Count I is GRANTED with respect to the time between the Ordinance's enactment and Catholic Charities' section 410(d) election and with respect to those benefits offered by Catholic Charities that are not covered by ERISA. The City's motion for summary judgment on the remaining counts is also GRANTED, and Catholic Charities' cross-motion on those counts is DENIED.

I have not ruled on Catholic Charities' request for injunctive relief. *See Wooley v. Maynard,* 430 U.S. 705, 711, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) ("[A] district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary."). If Catholic Charities wishes to press its request for injunctive relief, it shall request a conference of counsel.

So ORDERED.