PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 15-1172
_____

LAURENCE KAPLAN, on behalf of himself,
individually, and on behalf of all others similarly situated

v.

SAINT PETER'S HEALTHCARE SYSTEM;
RONALD C. RAK; SUSAN BALLESTERO, an individual;
GARRICK STOLDT, an individual;
JOHN and JANE DOES 1–20

Saint Peter's Healthcare System, Ronald
C. Rak, Susan Ballestero, Garrick Stoldt,
Appellants

_____

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 3-13-cv-02941)
District Judge: Honorable Michael A. Shipp

_____

Argued October 8, 2015

Before: McKEE, <u>Chief Judge</u>, AMBRO, and HARDIMAN,
<u>Circuit Judges</u>

(Opinion filed: December 29, 2015)

Jeffrey J. Greenbaum, Esquire        (Argued)
James M. Hirschhorn, Esquire
Sills, Cummis & Gross
One Riverfront Plaza
Newark, NJ 07102

Katherine M. Lieb, Esquire
Sills, Cummis & Gross
One Rockefeller Plaza
New York, NY 10020

      Counsel for Appellants
      Saint Peter's Healthcare System, Ronald C. Rak,
      Susan Ballestero, Garrick Stoldt

Monya M. Bunch, Esquire
Karen L. Handorf, Esquire            (Argued)
Mathew A. Smith, Esquire
Michelle C. Yau, Esquire
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, DC 20005

Ron Kilgard, Esquire
Keller Rohrback
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012

Lynn L. Sarko, Esquire
Havila C. Unrein, Esquire
Keller Rohrback
1201 Third Avenue, Suite 3200
Seattle, WA 98101

      Counsel for Appellee

Jeremy P. Blumenfeld, Esquire
Melissa D. Hill, Esquire
Morgan Lewis & Bockius
1701 Market Street
Philadelphia, PA 19103

      Counsel for *Amicus* Appellant
      Catholic Health East

Mark E. Chopko, Esquire
Marissa Parker, Esquire
Brandon Riley, Esquire
Stradley, Ronon, Stevens & Young
1250 Connecticut Avenue, N.W.
Washington, DC 20036

Lisa Gilden, Esquire
The Catholic Health Association of the United States
1875 Eye Street, N.W., Suite 1000
Washington, DC 20006

      Counsel for *Amicus* Appellant
      Catholic Health Association of the United States

Jared M. Haynie, Esquire

Chipman Gasser
2000 South Colorado Boulevard
Tower One, Suite 7500
Denver, CO 80222

James A. Sonne, Esquire
Stanford Law School
Religious Liberty Clinic
559 Nathan Abbott Way
Crown Quadrangle
Stanford, CA 94305

      Counsel for *Amicus* Appellant
      Becket Fund for Religious Liberty

Mary E. Signorille, Esquire
AARP Foundation Litigation
601 E Street, N.W.
Washington, DC 20049

Roberta L. Steele, Esquire
National Employment Lawyers Association
2201 Broadway, Suite 402
Oakland, CA 94612

      Counsel for *Amicus* Appellees
      AARP and National Employment Lawyers Association

Laurence A. Hansen, Esquire
Hugh S. Balsam, Esquire
Locke Lord
111 South Wacker Drive, Suite 4300
Chicago, IL 60606

G. Daniel Miller, Esquire
Conner & Winters, LLP
1627 Eye Street, N.W., Suite 900
Washington, DC 20006

     Counsel for *Amicus* Appellant
     GuideStone Financial Resources of
     the Southern Baptist Convention

Richard H. Frankel, Esquire
Drexel University
Thomas R. Kline School of Law
3320 Market Street
Philadelphia, PA 19104

Karen W. Ferguson, Esquire
Norman P. Stein, Esquire
Pension Rights Center
1350 Connecticut Avenue, N.W., Suite 206
Washington, DC 20036

     Counsel for *Amicus* Appellee
     Pension Rights Center

Patrick C. Elliott, Esquire
Andrew L. Seidel, Esquire
Freedom from Religion Foundation
P.O. Box 750
10 North Henry Street
Madison, WI 53703

     Counsel for *Amicus* Appellee
     Freedom from Religion Foundation

Gregory M. Lipper, Esquire
Ayesha N. Kahn, Esquire
Americans United for Separation of Church and State
1901 L Street, N.W., Suite 400
Washington, DC 20005

Daniel Mach, Esquire
American Civil Liberties Union Foundation
915 15th Street, N.W., 6th Floor
Washington, DC 20005

      Counsel for *Amicus* Appellees
      ACLU, ACLU of New Jersey, and
      Americans United for Separation of Church and State

_____

## OPINION OF THE COURT
_____

AMBRO, <u>Circuit Judge</u>

Subsection 4(b)(2) of the Employee Retirement Income Security Act ("ERISA") provides an exemption for church plans. These plans need not comply with a host of ERISA provisions, including fiduciary obligations and minimum-funding rules. ERISA § 3(33)(A) defines a church plan as one that is "established and maintained . . . for its employees (or their beneficiaries)" by a tax-exempt church. Subsection 3(33)(C)(i) clarifies that a "plan established and maintained" by a church includes a plan maintained by a qualifying agency of a church. But can a church agency, in addition to *maintaining* an exempt church plan, also *establish* such a plan? The District Court concluded that it cannot. We

6

agree. Per the plain text of ERISA, only a church can establish a plan that qualifies for an exemption under § 4(b)(2).[1] Because no church established St. Peter's Healthcare System's retirement plan, we hold that it is ineligible for a church plan exemption.

## I. Background

St. Peter's is a non-profit healthcare entity that runs a variety of facilities, including a hospital, and employs over 2,800 people. Though it is not a church, St. Peter's has ties to the Roman Catholic Diocese of Metuchen, New Jersey. For instance, the Bishop of Metuchen appoints all but two members of its Board of Governors. The Bishop also retains veto authority over the Board's actions. Meanwhile, the hospital run by St. Peter's features numerous indicia of the church relationship, including daily Mass and the presence of Catholic devotional pictures and statues throughout the building.

St. Peter's established the retirement plan before us in 1974. It is a non-contributory defined benefit plan, and it covers substantially all employees of St. Peter's hired before July 1, 2010. For more than three decades, St. Peter's operated the plan subject to ERISA and represented to its employees in plan documents and other materials that it was complying with ERISA. Eventually, however, St. Peter's began to consider whether the church plan exemption might apply to its retirement plan. To that end, it filed an application in 2006 with the Internal Revenue Service seeking such an exemption. The Internal Revenue Code borrows its definition of a church plan from ERISA. *See* 26 U.S.C. § 414(e).

---

[1] Subsection 4(b)(2) of ERISA is codified at 29 U.S.C. § 1003(b)(2). Subsection 3(33) is located at 29 U.S.C. § 1002(33).

Although the application signaled the belief of St. Peter's that it qualified for an ERISA exemption, it continued to pay ERISA-mandated insurance premiums for the retirement plan while the application was pending.

In May 2013, Laurence Kaplan, who worked for St. Peter's from 1985 to 1999, filed a putative class action alleging that St. Peter's failed to comply with various ERISA obligations.[2] Among other things, the complaint alleged that, in the years after St. Peter's filed the application for a church plan exemption, it did not provide ERISA-compliant summary plan descriptions or pension benefits statements. The most serious allegation was that, as of the end of 2011, the plan was underfunded by more than $70 million.[3] In August 2013, while the lawsuit was pending, St. Peter's received a private letter ruling from the IRS affirming the plan's status as an exempt church plan for tax purposes.[4]

St. Peter's moved to dismiss the suit, claiming that it qualified for ERISA's church plan exemption and hence was not required to comply with the provisions Kaplan claimed it had violated. Specifically, St. Peter's argued that the claimed exemption robbed the District Court of subject matter jurisdiction over the ERISA allegations and in the alternative

---

[2] The complaint also names certain individuals employed by St. Peter's. We refer to these individuals and their employer collectively as "St. Peter's."

[3] On appeal, Kaplan focuses on numbers from 2014. He says that those show that the plan was underfunded at that time by approximately $30 million. *See* Appellee's Br. at 5.

[4] As discussed in Part VII, this private letter ruling does not control our inquiry.

8

that the complaint failed to state a claim. The District Court denied the motion after concluding that St. Peter's could not establish an exempt church plan because it is not a church.

In reviewing the District Court's conclusion, we do not write on a blank slate. In the decades following the current church plan definition's enactment in 1980, various courts have assumed that entities that are not themselves churches, but have sufficiently strong ties to churches, can establish exempt church plans. *See, e.g.*, *Catholic Charities of Me., Inc. v. City of Portland*, 304 F. Supp. 2d 77, 84–85 (D. Me. 2004); *Humphrey v. Sisters of St. Francis Health Servs., Inc.*, 979 F. Supp. 781, 785–86 (N.D. Ind. 1997). The only Circuit to consider the question came to the same conclusion, albeit in a *dictum*. *See Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 547 (4th Cir. 2001). However, a new wave of litigation, of which this case is a part, has sprung up in the past few years and has presented an argument not previously considered by courts— that the actual words of the church plan definition preclude this result.

Riding this new wave, three other courts have agreed with the District Court here that only churches can establish exempt church plans. *See Stapleton v. Advocate Health Care Network*, 76 F. Supp. 3d 796, 806 (N.D. Ill. 2014); *Medina v. Catholic Health Initiatives*, No. 13-CV-01249, 2014 WL 3408690, at *9 (D. Colo. July 9, 2014); *Rollins v. Dignity Health*, 19 F. Supp. 3d 909, 917 (N.D. Cal. 2013). By contrast, three courts have ruled that plans established and maintained by church agencies can qualify for an exemption. *See Lann v. Trinity Health Corp.*, No. 8:14-cv-02237 (D. Md. Feb. 23, 2015) (ECF No. 54 at 1); *Medina v. Catholic Health Initiatives*, No. 13-CV-01249, 2014 WL 4244012, at *2 (D.

9

Colo. Aug. 26, 2014);[5] *Overall v. Ascension*, 23 F. Supp. 3d 816, 829 (E.D. Mich. 2014). The Seventh Circuit heard argument in *Stapleton* on September 18, 2015, but we are the first Circuit to decide the question in a holding.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1). St. Peter's filed a motion to dismiss, which the District Court denied. However, the Court permitted St. Peter's to seek leave from us to appeal, and we accepted the interlocutory appeal. We thus have jurisdiction under 28 U.S.C. § 1292(b). Our review of questions of law certified under this provision is plenary. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 621 F.3d 296, 301 (3d Cir. 2010).

## III. The Church Plan Exemption

When Congress enacted ERISA in 1974, § 3(33) defined a church plan as follows:

> (33)(A) The term "church plan" means (i) a plan established and maintained for its employees by a church or by a convention or

---

[5] The August 26, 2014 District Court opinion in *Medina*, written by Judge Blackburn, was on review of the July 9, 2014 opinion, written by Magistrate Judge Mix. Judge Blackburn rejected Magistrate Judge Mix's recommendation. In a later opinion, Judge Blackburn granted summary judgment to the defendants on the basis of a church plan exemption. *Medina v. Catholic Health Initiatives*, No. 13-CV-01249, 2015 WL 8144956, at *14 (D. Colo. Dec. 8, 2015).

10

association of churches which is exempt from tax under section 501 of the Internal Revenue Code of 1954, or (ii) a plan described in subparagraph (C).

. . .

(C) . . . [A] plan in existence on January 1, 1974, shall be treated as a "church plan" if it is established and maintained by a church or convention or association of churches for its employees and employees of one or more agencies of such church (or convention or association) . . . , and if such church (or convention or association) and each such agency is exempt from tax under section 501 of the Internal Revenue Code of 1954. The first sentence of this subparagraph shall not apply to any plan maintained for employees of an agency with respect to which the plan was not maintained on January 1, 1974. The first sentence of this subparagraph shall not apply with respect to any plan for any plan year beginning after December 31, 1982.

In the years following ERISA's enactment, this definition led to two problems, both of which are summarized here but discussed in more detail in Part VI below. First, experience showed that many churches established their own plans but relied on church pension boards for plan maintenance. Churches that followed this practice were concerned that their plans might not technically qualify as "established and maintained" by a church. Second, churches wanted the ability to continue to cover the employees of church agencies, such as church hospitals, after the sunset provision in § 3(33)(C) took effect at the end of 1982.

11

Congress addressed both concerns as part of the Multiemployer Pension Plan Amendments Act of 1980, which amended § 3(33) as follows:

> (33)(A) The term "church plan" means a plan established and maintained . . . for its employees (or their beneficiaries) by a church or by a convention or association of churches which is exempt from tax under section 501 of Title 26.
>
> . . .
>
> (C) For purposes of [paragraph 33]—
>
> (i) A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches includes a plan maintained by an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.[6]

---

[6] Although the statute speaks in terms of churches along with conventions or associations of churches, for ease of reference we refer to them collectively as "churches." Additionally, we refer to the principal-purpose entities described in

(ii) The term employee of a church or a convention or association of churches includes—

(I) a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry, regardless of the source of his compensation;

(II) an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches . . . .

This new definition solved both of the issues that stemmed from the 1974 definition. Specifically, new § 3(33)(C)(i) unambiguously brought within the exemption plans established by churches but maintained by church pension boards. And new § 3(33)(C)(ii) allowed churches to establish plans that covered church agency employees even after the sunset provision kicked in at the end of 1982.

However, St. Peter's argues that the 1980 amendments also accomplished a third result—annulling the requirement that a church establish a plan in order for it to qualify for an exemption. Under its proposed reading, any plan can qualify for the exemption regardless of who establishes it as long as it meets the maintenance requirements of § 3(33)(C)(i). As

§ 3(33)(C)(i) interchangeably as "church agencies" or "pension boards."

13

noted below, we believe this reading fails to follow the actual words of the provision.

## IV.  Plain Meaning

We start our review, as we must, with a familiar question: Do the words of the statute have "a plain and unambiguous meaning with regard to the particular dispute in the case"? *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (internal quotation marks omitted). Here, the statute has a plain meaning, and that meaning sets the result.

Subsection 3(33)(A) requires that all exempt plans be established by a church. Prior to 1980, a plan needed to be established *and* maintained by a church. The 1980 amendments provided an alternate way of meeting the maintenance requirement by allowing plans maintained by church agencies to fall within the exemption. But they did not do away with the requirement that a church establish a plan in the first instance. As the District Court explained,

> [t]he key to this interpretation is to recognize that subsection [3(33)]A is the gatekeeper to the church plan exemption: although the church plan definition, as defined in subsection A, is expanded by subsection C to include plans *maintained* by a tax-exempt organization, it nevertheless requires that the plan be *established* by a church or a convention or association of churches. In other words, if a church does not establish the plan, the inquiry ends there. If, on the other hand, a church establishes the plan, the remaining sections of the church plan definition are triggered.

*Kaplan v. Saint Peter's Healthcare Sys.*, No. 13-2941, 2014 WL 1284854, at \*5 (D.N.J. Mar. 31, 2014) (emphases in original).

St. Peter's responds by arguing that the language of § 3(33)(C)(i), which says that a plan "established and maintained" by a church "includes" a plan "maintained" by a qualifying church agency, means that any plan maintained, even if not established, by such an agency is exempt. This would be persuasive if there were only one requirement—maintenance—for an exemption. But here we have two requirements—establishment and maintenance—and only the latter is expanded by the use of "includes."

Indeed, St. Peter's essentially conceded the problem with its reading at oral argument when presented with the following scenario: Congress passes a law that any person who is disabled and a veteran is entitled to free insurance. In the ensuing years, there is a question about whether people who served in the National Guard are veterans for purposes of the statute. To clarify, Congress passes an amendment saying that, for purposes of the provision, "a person who is disabled and a veteran includes a person who served in the National Guard." Asked if a person who served in the National Guard but is not disabled qualifies to collect free insurance, St. Peter's responded that such a person does not because only the second of the two conditions was satisfied. This correct response only serves to highlight the fatal flaw in the construction of ERISA advanced by St. Peter's.

## V. Canons of Construction

Various canons of statutory construction add to the problems with the reading proposed by St. Peter's. First, if St. Peter's were right, the church establishment requirement in § 3(33)(A) would be superfluous. That is because any plan,

15

regardless of who established it, would be eligible for an exemption as long as it is maintained by an entity that meets the requirements of § 3(33)(C)(i). Creating such superfluous language is a result we attempt to avoid when construing a statute. *See Bennett v. Spear*, 520 U.S. 154, 173 (1997) (noting that it is a "cardinal principle of statutory construction" to "give effect, if possible, to every clause and word of a statute") (internal quotation marks omitted). This is particularly so where a contrary reading would "nullif[y]" a statute's "careful limitation." *Id.* Here, Congress carefully limited the church plan exemption to only those plans established by a church. In interpreting the statute, we must give meaning to this limitation.

Second, in cases where Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). This canon is known as *expressio unius est exclusio alterius* (to express one is to exclude others). Here, Congress could have said that a plan "established and maintained" by a church includes a plan "established and maintained" by a church agency. But the final legislation did not say that. Tellingly, however, draft legislation introduced in 1978 by Representative Barber B. Conable, Jr. to amend the Internal Revenue Code had precisely that language. *See Kaplan*, 2014 WL 1284854, at *9 n.4 (quoting 124 Cong. Rec. 12108 (May 2, 1978)). If Representative Conable's text had been adopted, it would be quite clear that church establishment of a plan would no longer be a prerequisite for the exemption. But by the time Congress passed the 1980 ERISA amendments, the second

16

"established" was gone.[7] This deletion from one version to another "is fairly seen . . . as a deliberate elimination of any possibility" of construing the statute to have the meaning it would have had in the rejected version. *Doe v. Chao*, 540 U.S. 614, 623 (2004).

Third, we have noted that ERISA is a "remedial" statute that should be "liberally construed in favor of protecting the participants in employee benefit plans." *IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986). As certain of the *amici* explain, exempt church plans lack many of the protections associated with ERISA. Features that ERISA plans have that church plans need not follow include fiduciary duties and minimum-funding protections. *See, e.g.*, Nat'l Emp't Lawyers Assoc. & AARP Found. *Amicus* Br. at 11–19. Excluding plans established by church agencies could take a large number of employees outside the scope of these ERISA protections. For instance, as of 2012 religiously affiliated hospitals accounted for seven of the country's ten largest non-profit healthcare systems. ACLU & Americans United for Separation of Church and State *Amicus* Br. at 22. As the District Court noted, construing plans established by church hospitals to be exempt "would achieve quite the opposite" result of the canon directing us to construe exemptions narrowly. *Kaplan*, 2014 WL 1284854, at *6.

---

[7] Viewed in light of the purpose of the provision, the use of the current language rather than Rep. Conable's version makes sense. As discussed in Part VI below, the purpose of § 3(33)(C)(i) was not to deal with a plan established and maintained by a church agency but rather to account for a plan established by a church and maintained by its pension board (*i.e.*, a church agency).

St. Peter's, for its part, contends that a fourth canon, construing provisions in light of their statutory neighbors, favors its reading. Specifically, it points to ERISA's governmental plan exemption. ERISA § 3(32), 29 U.S.C § 1002(32), defines an exempt governmental plan to mean "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." The provision goes on to say that an exempt governmental plan "includes," among other options, certain plans to which the Railroad Retirement Act of 1935 applies and certain plans "established and maintained" by Native American tribal governments. St. Peter's uses this as an example of an instance in which the initial definition of an exempt plan is enlarged through the use of "includes."

But the governmental plan provision hurts, not helps, St. Peter's. It shows that Congress considers "established" and "maintained" to be different terms, as either is sufficient for the plans of the federal government and state governments, but both are required for Native American tribal plans. For the church plan exemption before us, Congress did not, as it did with plans of the federal government and state governments, say that either establishment or maintenance is sufficient for ERISA exemption. Rather, Congress explicitly required both (subject to the caveat that the second requirement could be met in the case of a plan maintained by a qualifying church agency).

* * *

18

In this context, even if St. Peter's may maintain an exempt church plan,[8] it cannot establish one. The plain terms of ERISA only make these exemptions available to plans established in the first instance by churches. Because St. Peter's is not a church, the exemption is unavailable, and it is not entitled to dismissal of Kaplan's complaint on that basis.

---

[8] Although we need not decide the issue, we have substantial reservations over whether St. Peter's can even maintain an exempt plan. Subsection 3(33)(C)(i) requires that if a plan is to be maintained by an organization that is not a church, it must be an organization "the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches . . . ." In addition, the same subsection requires that the organization be "controlled by or associated with a church or a convention or association of churches." Setting aside whether St. Peter's is controlled by or associated with a church (as that depends on disputed facts not properly resolvable at the motion-to-dismiss stage), St. Peter's itself does not appear to meet the principal purpose test, as its principal purpose is the provision of healthcare and not the administration or funding of the retirement plan. St. Peter's contends, however, that its Retirement Plan Committee qualifies because the Committee's principal purpose is to maintain the plan. However, this may be insufficient. *See Rollins*, 19 F. Supp. 3d at 914 ("[T]he statute does not say that the organization may have a subcommittee who deals with plan administration. Rather, the statute dictates that [the] organization itself must have benefits plan administration as its 'principal purpose,' which Dignity plainly does not.").

19

## VI.  Legislative History

Because the terms of the statute are unambiguous, we need go no further. However, because the parties have devoted considerable resources to briefing and arguing the legislative history of the church plan exemption, we turn to it now. Even if the statute were ambiguous and the legislative history bore on our analysis, the result would be the same. Indeed, the legislative history of § 3(33) reinforces our conclusion that the exemption is only available to plans established by churches. Specifically, that history demonstrates that the purposes of the 1980 amendments were to account for plans established by churches but maintained by church agencies (hence the adoption of § 3(33)(C)(i)) and to extend the sunset provision set to take effect at the end of 1982 (thus the adoption of § 3(33)(C)(ii)).

St. Peter's places great emphasis on the following floor statement from Senator Herman Talmadge, a co-sponsor of the 1980 church plan amendments, regarding the purpose of the 1980 language:

> Church agencies are essential to the churches' mission. They are for the sick and needy and disseminate religious instruction. They are, in fact, part of the churches. As a practical matter, it is doubtful that the agency plans would survive subjection to ERISA. There is an essential difference between the plans of business[es] and the plans of church institutions. If a business incurs increased plan maintenance costs, it merely passes these on to the consumer. The incomes of most church agencies, on the other hand, are dependent solely upon tithes and other offerings. There is virtually no way for them to compensate for the

additional costs of complying with ERISA. The churches fear that many of the agencies would abandon their plans. We are concerned today that the requirements of ERISA [have] made the maintenance of plans too expensive and demanding even for businesses which have the capacity to absorb additional costs. The impact of ERISA on church agencies would be many times as serious as that on businesses.

JA 122.[9]

St. Peter's contends that this statement makes clear that Congress was focused on plans established by church agencies. Not so. Rather, the context demonstrates that Senator Talmadge's real concern was the sunset provision set to take effect at the end of 1982. As discussed, the initial definition of a church plan was one "established and maintained for its employees by a church." Existing plans established and maintained by churches were allowed to cover employees of church agencies, but only until the end of 1982. This was not a question of who established and maintained the plans, as only churches could. Instead, the issue was that no exempt plans would be allowed to cover agency employees after 1982 (unless the agency itself qualified as a church). Indeed, Senator Talmadge made the comments above in the context of explaining why churches, after 1982, would need to "divide their plans into two so that one will cover church employees and the other . . . agency employees." *Id.* Absent an amendment, the plans in the latter category would not qualify for the exemption. That was the real threat to plans covering agency employees.

---

[9] "JA" refers to the parties' joint appendix.

The reliance of St. Peter's on statements by Deputy Assistant Secretary of the Treasury Daniel Halperin during a hearing on the proposed legislation is similarly misplaced. St. Peter's highlights his statement that Treasury's "most serious concern" was that the amendments "would exclude church agencies from the protection of ERISA, and that would mean that if somebody works for a hospital or a school that happens to be affiliated with a church it would be permissible for that plan to provide no retirement benefits unless they work until age 65, for example." Appellants' Addendum at 8. This does not help St. Peter's. Assistant Secretary Halperin was merely pointing out that, if the sunset provision took effect, employees of church agencies could not be included within the then-existing exemption, and a plan covering them would instead be subject to ERISA even if a church itself established it. However, nothing in the statement connotes that plans *established by church agencies* would be eligible for the exemption.

Similarly, St. Peter's does not benefit from the statement of Senator Jacob Javits, the general sponsor of the legislation in which the 1980 amendments were included. Senator Javits said that he was "not too happy" that the amendments would exempt "those who work for schools and similar institutions which are church-related." JA 1524. Again, this relates to Congress' decision not to allow the sunset provision to take effect.

More to the point, the legislative history demonstrates that the purpose of § 3(33)(C)(i), the statutory provision on which St. Peter's most heavily relies, was to bring explicitly within the exemption plans established by churches but maintained by church agencies known as pension boards. Senator Talmadge explained that "the church plan definition is so narrowly drawn that it does not in many ways even approximate the way church plans are organized or operated."

22

JA 122. He mentioned congregational, as opposed to hierarchical, denominations, noting: "Most church plans of congregational denominations are administered by a pension board. This is usually an organization separately incorporated from, but controlled by, the denomination." *Id.* There was some confusion as to whether such a structure qualified for an exemption. *Id.* As Senator Talmadge explained to the Senate Committee on Finance, the amendments dealt with that issue by expanding the definition to include "church plans which rather than being maintained directly by a church are instead maintained by a pension board maintained by a church." Senate Committee on Finance, Executive Session Minutes, June 12, 1980, at 40.

St. Peter's, despite a lengthy discussion of legislative history, has not pointed to a single statement showing that Congress, in addition to being concerned about the sunset provision and plans maintained by pension boards (*i.e.*, church agencies), was also focused on plans *established* by those agencies. Rather, that history overwhelmingly supports the conclusion that Congress did not intend to open up the exemption that broadly.

## VII. IRS Rulings

St. Peter's also seeks to imbue with considerable weight the interpretation that the IRS has given to the church plan definition. As discussed, the Internal Revenue Code gets its definition of church plans from ERISA. Construing the initial 1974 definition, the IRS took the position that healthcare companies with religious missions were not eligible for the church plan exemption because they were not performing sufficiently religious functions. I.R.S. Gen. Couns. Mem. 37,266 (Sept. 22, 1977). Essentially, the IRS' position was that only church agencies that themselves could qualify as churches could establish exempt plans.

But the IRS changed course in 1983 based on its interpretation of the 1980 amendments and began issuing exemptions to plans that were not established by churches. A 1983 IRS memorandum stated that because "religious orders can now have their employees covered by a church plan without a determination that such orders are churches, [an order's] nonchurch status is not fatal." I.R.S. Gen. Couns. Mem. 39,007 (July 1, 1983). According to St. Peter's, the IRS has issued at least several hundred exemptions based on that reasoning. And, as discussed, St. Peter's itself received an exemption from the IRS in 2013, after this lawsuit was filed. St. Peter's also notes that the Department of Labor has issued several exemptions of its own based on the IRS' position.

However, because the IRS' position came in a general counsel memorandum and not as a result of "formal adjudication or notice-and-comment rulemaking," its interpretation is owed deference "only to the extent that [it has] the power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (internal quotation marks omitted). The IRS' 1983 memorandum lacks the power to persuade because it does not even consider the church establishment requirement of § 3(33)(A). Rather, it skips directly (and inexplicably) to § 3(33)(C). Because the IRS' position is at odds with the statutory text, we owe it no deference.

## VIII. Congressional Ratification

St. Peter's also advances a congressional ratification argument. Specifically, it notes that, following the IRS' 1983 memorandum, Congress has incorporated the church plan definition from the 1980 amendments into a variety of other laws. *See, e.g.*, 26 U.S.C. § 4980D(b)(3)(C) (excluding church plans from certain minimum excise taxes imposed on health plans); 15 U.S.C. § 80a-3(c)(14) (excluding church plans from the definition of investment companies under the

24

Investment Company Act of 1940). From this, St. Peter's contends that Congress legislated against the backdrop of the 1983 IRS memorandum and should be presumed to have approved that interpretation when reusing the definition.

It is true as a general matter that when it "adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." *Lorillard v. Pons*, 434 U.S. 575, 581 (1978). However, in *Lorillard* "Congress exhibited . . . a detailed knowledge of the [statutory] provisions and their . . . interpretation." *Id.* St. Peter's has not shown any evidence that Congress had such a detailed knowledge in this case. Moreover, ratification does not apply where, as is the case here, the statute has a plain meaning that is inconsistent with the proposed interpretation. *Dutton v. Wolpoff & Abramson*, 5 F.3d 649, 655 (3d Cir. 1993). As a result, ratification cannot salvage things for St. Peter's.

## IX.  Free Exercise Clause

Finally, St. Peter's raises an argument under the First Amendment's Free Exercise Clause. It asserts that failing to adopt its position would create constitutional "[i]ssues." Appellants' Br. at 47. It is not clear whether St. Peter's is invoking the doctrine of constitutional avoidance or is instead raising a full-blown constitutional challenge. In any event, the argument fails. St. Peter's bases its constitutional concerns on the premise that, if church agencies cannot establish their own plans, the IRS will be forced, in considering requests for exemptions, to determine on an individualized basis whether particular agencies are performing sufficiently religious functions such that they can themselves qualify as churches. This is the approach the IRS took to agency-established plans prior to the 1983 memorandum. The argument misses the

25

point. Churches and agencies can avoid this inquiry altogether by having a church establish the plan in the first instance. Plans established by churches are explicitly permitted under § 3(33)(C)(ii) to cover agency employees.

St. Peter's has not offered any reason why the First Amendment entitles it to a retirement plan structured using a particular corporate form. The ability of church agencies to have their employees covered by exempt plans is by no means eliminated by our reading. We have merely determined that Congress has required that such coverage come in the form of plans established by churches. Even assuming that St. Peter's has a constitutional right to have its employees covered by an exempt plan, this arrangement does not unduly interfere with that.

Moreover, to the extent that St. Peter's also suggests that Congress cannot validly distinguish between churches and church agencies, that argument is unpersuasive. Indeed, Congress regularly applies provisions to churches without reference to church agencies. *See, e.g.*, 26 U.S.C. § 514(b)(3)(E) (creating a special rule for churches with respect to real property acquired for tax-exempt use); 26 U.S.C. § 170(b)(1)(A)(i) (allowing deductions for charitable contributions to churches). *See also Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 272 (D.C. Cir. 2014), *cert. granted*, 84 U.S.L.W. 3257 (U.S. Nov. 6, 2015) (No. 14-1453) (describing the distinction between "churches . . . and nonprofit organizations that may have a religious character or affiliation, such as universities and hospitals" as "long-recognized" and "permissible"); *Found. of Human Understanding v. United States*, 614 F.3d 1383, 1389 (Fed. Cir. 2010) (noting, in context of 26 U.S.C. § 170(b)(1)(A)(i), the "generally accepted principle" that Congress intended to distinguish between churches and other religious organizations).

\* \* \* \* \*

In interpreting a statute, we presume that Congress means what it says. Ever since it enacted ERISA in 1974, establishment of a pension plan by a church has been a prerequisite to triggering the exemption from ERISA. Nothing in the 1980 amendments changed that. St. Peter's sought dismissal of the putative class action on the ground that its plan qualifies for the church plan exemption. However, that exemption is unavailable here, as the plan was not established by a church. We therefore affirm the District Court's denial of the motion to dismiss.