In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-1368

MARIA STAPLETON, et al.,

*Plaintiffs-Appellees*,

*v.*

ADVOCATE HEALTH CARE NETWORK,
AN ILLINOIS NON-profit CORPORATION, et al.,

*Defendants-Appellants*.

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cv-01873 — **Edmond E. Chang**, *Judge*.

---

ARGUED SEPTEMBER 18, 2015 — DECIDED MARCH 17, 2016

---

Before BAUER, KANNE, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge*. The Employee Retirement Income Security Act (ERISA) protects employees from unexpected losses in their retirement plans by setting forth specific safeguards for those employee plans. The Act, however, exempts church plans from those requirements. This case explores the question that has been brewing in the lower federal courts: whether a plan established by a church-affiliated organiza-

tion, such as a hospital, is also exempt from ERISA's reach. We conclude that it is not.

## I.

In response to several highly publicized private pension plan failures, Congress enacted ERISA in 1974, with the goal of protecting employees' retirement benefits and ensuring that employees would receive the retirement benefits that employers had promised them and upon which they had counted. Before ERISA, employers who sponsored pension plans were not required to ensure that they were funded adequately, stand behind them if they failed, or provide insurance to protect recipients' benefits. As a result, some pension plans failed, leaving employees without the pensions they had spent their careers building. Congress recognized that existing state and common law protections failed to sufficiently protect employee retirement security and consequently, enacted ERISA. 29 U.S.C. § 1001 *et. seq.* ERISA protects employees through a number of safeguards including minimum funding and vesting requirements, insuring plan benefits through the Pension Benefit Guarantee Corporation and requiring certain reporting, disclosures, and fiduciary responsibilities. *See, e.g.*, 29 U.S.C. §§ 1083, 1053, 1021-1026, 1104-1112, 1307, 1308, 1322. Those protections increase the cost of running a pension plan, on the one hand, but, on the other hand, protect employees from losing savings meant for their retirement years from either intentional mishandling of funds or innocent mismanagement.

Because of the broad protective goals of ERISA, Congress carved out only narrow exemptions for employee-benefit plans, including those for churches whose plans were excused from regulation in order to prevent excessive govern-

ment entanglement with religion.[1] Thus a church plan is exempt from ERISA regulation. But the question presented in this case is: does a plan established by a church-affiliated organization, like the defendant here, Advocate Health Care Network, qualify as a church plan under ERISA?[2]

This same question is springing up across the country and although the district courts have heretofore been divided with no rulings from the circuit courts, the Third Circuit, just a short while ago, became the first circuit court to weigh in on the debate, siding with the district court in this case below that a church-affiliated organization such as Advocate cannot establish an ERISA-exempt plan. *Kaplan v. St. Peter's Healthcare Sys.*, 810 F.3d 175 (3d Cir. 2015). In addition to the district court below and the Third Circuit, the court in *Rollins v. Dignity Health*, 19 F. Supp. 3d 909, 917 (N.D. Cal. 2013), *appeal filed*, No. 15-15351 (9th Cir. Feb. 26, 2016), has come to the same conclusion. On the other hand, several district courts have recently ruled that plans established by church-affiliated agencies can indeed qualify for the ERISA church plan exemption. *See, e.g.*, *Lann v. Trinity Health Corp.*, No. 8:14-cv-02237, 2015 WL 6468197, at *1 (D. Md. Feb. 24, 2015); *Medina v. Catholic Health Initiatives*, No. 13-CV-01249, 2014 WL 4244012, at *2 (D. Colo. Aug 26, 2014)[3]; *Overall v. Ascen-*

---

[1] Congress used the term "church plan" in enacting ERISA, but the exemption, of course, also applies to mosques, synagogues, temples, meeting houses, and all other houses of worship.

[2] We assume, for the time-being, that Advocate is indeed a church-affiliated organization—a question we discuss below, but need not resolve in this litigation. *See* note 5, *infra*.

[3] The magistrate judge in *Medina v. Catholic Health Initiatives*, No. 13-cv-01249, 2014 WL 3408690 (D. Colo. July 9, 2014) also agreed with the con-

*sion*, 23 F. Supp. 3d 816, 829 (E.D. Mich. 2014). Today this Circuit weighs in on the debate, siding with our colleagues on the Third Circuit.

The plaintiffs, Maria Stapleton, Judith Lukas, Sharon Roberts, and Antoine Fox are former and current Advocate employees with vested claims to benefits under the Advocate retirement plan. They have brought their complaint as a proposed class action on behalf of all participants or beneficiaries of the Advocate plan. The plaintiffs allege that Advocate has not maintained its pension plan according to the standards set forth by ERISA, 29 U.S.C. § 1001 *et. seq.*, and thus has breached its fiduciary duty and harmed the plan's participants in the following way: by requiring an improperly long period of five years of service to become fully vested in accrued benefits; failing to file reports and notices related to benefits and funding; funding the plan at insufficient levels; neglecting to provide written procedures in connection with the plan; placing the plan's assets in a trust that does not meet statutory requirements; and failing to clarify participants' rights to future benefits. The plaintiffs argue in the alternative that if Advocate successfully evades liability under the church plan exemption, that this provision of ERISA

---

clusion we reach, but her recommendation was rejected by the district court judge in *Medina v. Catholic Health Initiatives*, No. 13-cv-01249, 2014 WL 4244012 (D. Colo. Aug. 26, 2014). We side with the decision of the magistrate judge who carefully dissected the plain language of the statute and concluded, as we do, that "in order to qualify as a church plan under ERISA, a benefit plan must be established by a church or a convention or association of churches" rather than the perfunctory decision of the district court judge who dismissed the plain language as a mere "term of art" without further analysis.

is void as an unconstitutional violation of the First Amendment's prohibition on state establishment of religion.

Advocate operates twelve hospitals and more than 250 other inpatient and outpatient healthcare locations across northern and central Illinois, employing 33,000 people and generating $4.6 billion in annual revenue. Advocate maintains a non-contributory, defined-benefit pension plan that covers substantially all of its employees. Advocate's predecessor established the plan and Advocate maintains it now. Advocate is responsible for funding the plan and has the power to continue, amend, or terminate the plan. Advocate does not fund, insure, or administer the funds in compliance with all of the terms of ERISA as it believes that it is exempt from complying with those provisions. It goes without saying that Advocate is not a church. Nor was its predecessor. It formed in 1995 as a 501(c)(3) non-profit corporation from a merger between two health systems—Lutheran General HealthSystem and Evangelical Health Systems. Today, Advocate is affiliated with both the Metropolitan Chicago Synod of the Evangelical Lutheran Church in America and the Illinois Conference of the United Church of Christ, but it is not owned or financially supported by either church. It is, however, a party to contractual relationships with them, in which they "affirm their ministry in health care and the covenantal relationship they share with one another." There is no requirement that Advocate employees or patients belong to any particular religious denomination, or uphold any particular religious beliefs.

Before the district court, the plaintiffs sought a declaration that the Advocate plan is a benefits plan subject to the regulations of ERISA, or in the alternative, a declaration that

a church plan exemption is unconstitutional. They also sought an injunction requiring Advocate to reform the plan to comply with ERISA's requirements and an award of civil penalties, and damages. Advocate moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), arguing that its plan falls within the church plan exemption[4].The district court denied the defendants' motion, holding that the plan "is not entitled to ERISA's church plan exemption as a matter of law" because the statutory definition required a church plan to be established by a church. D. Ct. Order at 20 (R. 64, p.20).

## II.

Advocate claims that, because the plan is a church plan and thus exempt from ERISA, the plaintiffs have failed to state a claim upon which relief can be granted and the complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). In order to survive this challenge, the complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must accept as true the complaint's factual allegations and draw reasonable inference in the plaintiffs' favor. *Ashcroft v. Al-Kidd*, 131 S. Ct. 2074, 2079 (2011). We review a decision denying a motion to

---

[4] Although Advocate premised its motion to dismiss on both a failure to state a claim under Rule 12(b)(6) and a lack of subject matter jurisdiction under 12(b)(1), the district court made short order of the claim under 12(b)(1) noting that "[t]o ask whether a federal law like ERISA reaches a certain actor or conduct in the first place is itself a merits question , not a jurisdictional one. D. Ct. Order at 5 (R. 64, p.5) (*citing Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010)).

dismiss de novo. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010).

Although ERISA does indeed broadly protect the interests of participants in employee benefit plans, Congress specifically exempted certain types of plans from the scope of ERISA, including those set up by federal, state, local or tribal governments, 29 U.S.C. §§ 1002(32), 1003(b)(1), and any "church plan," 29 U.S.C. § 1003(b)(2), the latter of which is at issue here.

**A.**

The sole question in this case is whether Advocate's plan is a church plan as defined by ERISA. To answer this question we turn, as we do in all cases of statutory construction, to the language of the statute—in this case, to the definitions of an ERISA church plan contained in subsection (33)(A) and subsection (33)(C)(i) of the statute. 29 U.S.C. §§ 1002(33)(A), (33)(C)(i). *See, e.g. In re B.R. Brookfield Commons No. 1 LLC*, 735 F.3d 596, 598 (7th Cir. 2013) (directing courts to turn first to the statutory language). Where Congress's intent is clear from that language, we must give it effect. *Rush Univ. Med. Ctr. v. Burwell*, 763 F.3d 754, 759 (7th Cir. 2014).

Subsection (33)(A) of ERISA defines a church plan as a "plan established and maintained" by a church. 29 U.S.C. § 1002(33)(A). In short, two separate elements must both be met for the exemption to apply: (1) a church must first create or establish the plan and then (2) maintain the plan.

If the statute stopped there, Advocate would clearly lose, as the plan was not established by a church. It is uncontroverted that Advocate (or, more precisely, its predecessors) established the plan and that it is not (and the predecessors

were not) a church. Advocate, however, argues that a later part of the statute, subsection (33)(C), enlarges the definition of a church plan. That section states as follows:

> **(C)** For purposes of this paragraph—
>
> **(i)** *A plan established and maintained for its employees (or their beneficiaries) by a church or by a convention or association of churches* **includes a plan maintained by an organization**, <u>whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches.</u>

29 U.S.C. § 1002(C)(i) (all emphases supplied).

For purposes of clarity in this opinion we can divide this paragraph of (33)(C)(i) into the following three parts, which we address out of order to help isolate the issue in this case.

- **The (33)(A) definition of a church plan.** The first part, which we have italicized above, is essentially identical to the definition of a "church plan" in subsection (33)(A). In other words, subsection (33)(C)(i) repeats (33)(A), reminding us that a "church plan" means a plan established and maintained by a church. Thus the italicized portion of subsection (33)(C)(i) can be simplified by saying "a church plan … ."

- **The church-affiliated organization language.** The final and underlined portion of the subsection simply defines

which types of organizations are church-affiliated organizations and thus qualified to run and maintain an ERISA plan. This portion of the subsection is not at issue and we will simply refer to these organizations as "church-affiliated organizations."

- **The controverted language.** The language we have placed in bold above—"**includes a plan maintained by an organization**"—forms the heart of the dispute.

If we use the linguistic simplifications we describe in the bullet points above, leaving intact the controverted language, the whole subsection reads as follows: "A church plan includes a plan maintained by a church-affiliated organization."

Advocate interprets this language as expanding the definition of church plan so that if an otherwise qualifying organization simply *maintains* the plan, it has fully satisfied all of subsection (33)(A), even if the plan was not also *established* by a church.

The district court disagreed, finding instead that subsection (33)(C)(i)'s use of the word "includes" means that it "identifies a *subset* of plans that qualify for the church plan exemption as defined by subsection 33(A)—specifically, plans need not be maintained by a church, and instead may be maintained by a church-affiliated corporation." D. Ct. Order at 9 (R. 64, p.9) (emphasis in original). The district court then went on to note that (33)(C)(i) says nothing about a plan established by an affiliated organization. *Id.*

At the risk of over-simplifying, we offer the following summary of the statute and the parties' positions.

The statute simplified: A church plan includes a plan maintained by a church affiliated organization.

Advocate's position on what this means: A plan established and maintained by a church includes a plan established by a church-affiliated organization (and maintained by either a church or a church affiliated organization).

The plaintiffs' position: A plan established and maintained by a church also includes a plan established by a church but maintained by a church-affiliated organization.

The district court, siding with the plaintiffs, concluded that the plain language of subsections (33)(A) and (33)(C)(i) together defines church plans as follows:

• A church plan established by a church and maintained by a church is a church plan.

• A church plan established by a church and maintained by a church-affiliated organization is a church plan.

• A church plan established by a church-affiliated organization and maintained by a church-affiliated organization is not a church plan.

In other words there are "two requirements—establishment and maintenance—and only the latter is expanded by the use of "includes" in subsection (33)(C)(i). *Kaplan*, 810 F.3d at 181. Because the plan here was both es-

tablished and maintained by a church-affiliated organization, it is not a church plan.

Advocate's position—that a plan qualifies as a church plan merely by being maintained by a church-affiliated organization—has a fatal flaw. If a plan could qualify solely on the basis of being maintained by a church-affiliated organization, the "established by a church" requirement of subsection (33)(A) would become meaningless. And we know that this is not so, for subsection (33)(A) is a separate, independent requirement of the statute. Advocate's reading, therefore, violates a cardinal rule of statutory interpretation that every word and clause must be given meaning. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Doe v. Chao*, 540 U.S. 614, 630-31 (2004); *see also Kaplan*, 810 F.3d at 181 ("If [the hospital] were right, the church establishment requirement in § (33)(A) would be superfluous … a result we attempt to avoid when construing a statute). Thus the plain language of (33)(C) merely adds an alternative meaning to one of subsection (33)(A)'s two elements—"maintain" element—but does not change the fact that a plan must still be established by a church. *Kaplan*, 810 F.3d at 180. (The term "includes" merely provides an alternative to the maintenance requirement but does not eliminate the establishment requirement.);[5] *Rollins*, 19 F. Supp. 3d

---

[5] The Third Circuit, in *Kaplan*, questioned whether the similarly situated hospital in that case, St. Peter's Hospital, could even maintain an exempt plan. The court questioned, without needing to decide, whether the hospital could meet the requirement that a church-affiliated organization have the principal purpose of administering or funding the plan, and whether the hospital was indeed "controlled" by a church. These same

at 914 ("if all that is required for a plan to qualify as a church plan is that it meet subsection C's requirement that it be maintained by a church-associated organization, then there would be no purpose for subsection A, which defines a church plan as one established and maintained by a church.").

The Third Circuit provided an illuminating hypothetical to demonstrate why this must be so. In its hypothetical, the Third Circuit supposed that Congress passed a law that any person who is disabled and a veteran was entitled to free insurance. The court then imagined that in the ensuing years, questions arose as to whether people who served in the National Guard are veterans for purposes of the statute. To clarify the provision, Congress passed an amendment saying that "for purposes of the provision, a person who is disabled and a veteran includes a person in the National Guard." *Kaplan*, 810 F.3d at 181. All parties conceded that a person who served in the National Guard but who was not disabled could not qualify for free insurance in this hypothetical because only the second of the two original conditions was satisfied. *Id.* For the same reason, it must be true that both conditions of the original definition of a church plan must be satisfied here.

We simply cannot gloss over the fact that Congress included the word "established" in subsection (33)(A) but excluded it in subsection (33)(C)(i). In the latter subsection, "Congress could have said that a plan 'established and

questions arise in the litigation before us, but, like the Third Circuit, we find that they need not be resolved, as we have concluded that the Advocate plan is not exempt from ERISA in the first instance. *Kaplan*, 810 F.3d at 183 n.8.

maintained' by a church includes a plan 'established and maintained' by a church agency," but despite an earlier proposal to do just that (which we will discuss in more detail below), "the final legislation did not say that." *Kaplan*, 810 F.3d at 182; *See also Rollins*, 19 F. Supp. 3d at 915 ("To assert that any church-associated organization can establish its own church plan fails to appreciate the distinction drawn by Congress through its purposeful word choice," that is, including the word "establish" in subsection (33)(A), but excluding it in subsection (33)(C)(i)). Congress used the word "establish and maintain" in subsection (33)(A) as something only a church may do. It used the word "maintain" in subsection (33)(C)(i) to refer to the requirements for church-affiliated organizations. The plain language difference between subsections (33)(A) and (C)(i) must be assumed to reflect deliberate choices made by Congress. *See Russello v. U.S.*, 464 U.S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.")

One of Advocate's main arguments is that the word "includes" expands rather than contracts the boundaries of what can be encompassed within the definition of a church plan. On this we do not disagree. Subsection (33)(C) expanded the definition of church plans from the narrower scope of those that were both established and maintained by a church to those that were established by a church but maintained by a church-affiliated organization. But, again, giving proper due to subsection (33)(A) and its relationship with (33)(C)(i), it becomes clear that the word "includes" expands upon who may maintain a plan, but not who may establish one.

*Kaplan*, 810 F.3d at 180; *Rollins*, 19 F. Supp. 3d at 915 ("only the category of 'who may maintain a church plan' is being expanded upon in subsection C(i), not the category of 'who may establish a plan.'").

A plain meaning reading also rules out Advocate's interpretation of subsection (33)(C)(ii) as supporting its theory that a church-affiliated organization can establish a church plan. That provision, states:

> **(ii)** The term employee of a church or a convention or association of churches includes—
>
> \*\*\*
>
> **(II)** an employee of an organization, whether a civil law corporation or otherwise, which is exempt from tax under section 501 of Title 26 and which is controlled by or associated with a church or a convention or association of churches;

29 U.S.C. § 1002 (33)(C)(ii).

In short, it states that employees of a qualifying church-affiliated organization may be considered employees of a church for purposes of the exemption. The redefinition was necessary because both ERISA and the Internal Revenue Code require a plan to be sponsored by an employer for the benefit of its employees. 29 U.S.C. § 1002(2); 26 U.S.C. § 401(a). If a plan established by a church also covered employees of a church-associated organization, it would lose its status as a "plan" for the purposes of ERISA and tax-qualification requirements, unless those employees were deemed employees of that church and that church was

deemed their employer. Subsection (33)(C)(ii) resolved this problem.

Just as with subsection (33)(C)(i), this subsection does nothing to render inoperative subsection (33)(A)'s gate-keeping requirement that the plan first be established by a church. The fact that an established church plan may include employees of a church-affiliated organization does not mean that the church-affiliated organization may establish the plan in the first place. *See e.g., Kaplan v. Saint Peter's Healthcare Sys.*, No. Civ. A. 13-2941, 2014 WL 1284854, at *5 (D.N.J. Mar. 31, 2014), *aff'd*, 810 F.3d 175 (3d Cir. 2015) ("Once a church plan is established [by a church], subsection C(ii) delineates what individuals may participate in the church plan as employees of the church."); *Rollins*, 19 F. Supp. 3d at 915 ("Section C(ii) merely explains which employees a church plan may cover—once a valid church plan is established. It does nothing more.")

Other than the Third Circuit, which has concluded as we have, that a plan established by a religiously-affiliated hospital is not exempt from ERISA, no other circuit has directly addressed this question. Until this recent spate of litigation, most courts evaluating church plans were looking primarily at whether factually, the institutions were sufficiently affiliated with a church, and in doing so, merely glossed over the statutory language and assumed that the exemption applied to plans established by church-affiliated agencies. *See, e.g., Hall v. USAble Life*, 774 F. Supp. 2d 953, 958-59 (E.D. Ark. 2011); *Thorkelson v. Publ'g House of the Evangelical Lutheran Church in Am.*, 764 F. Supp. 2d 1119, 1128-29 (D. Minn. 2011); *Rinehart v. Life Ins. Co. of N. Am.*, No. C08-5486 RBL, 2009 WL 995715, at *4 (W.D. Wash. Apr. 14, 2009); *Catholic Charities of*

*Maine, Inc. v. City of Portland*, 304 F. Supp. 2d 77, 85 (D. Me. 2004). And indeed, this is how the Fourth Circuit—the only other circuit to even tangentially address the question— proceeded. It stated that "a plan established by a corporation associated with a church can still qualify as a church plan." *Lown v. Cont'l Cas. Co.*, 238 F.3d 543, 547 (4th Cir. 2001) but did so based solely on the language of subsection (33)(C)(i) without any explanation for the discrepancy with subsection (33)(C)(A) requiring that the plan be established by a church. *Id*. Such an omission violates the primary rule of statutory construction that a court must give effect to the language of the statute as a whole. "Whether in dealing with the macro-cosm of the entire statute or with the microcosm of the par-ticular subsection before us, we must view the text as a whole and give effect to all of the statutory language." *U.S. v. Johnson*, 152 F.3d 618, 623-24 (7th Cir. 1998). *See also King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("Our duty, after all, is 'to construe statutes, not isolated provisions.'"). In any event, the Fourth Circuit's statement was mere dicta, for that court ultimately decided that the exemption did not apply because the hospital was not associated with or controlled by a church. *Id.* at 548. And in this case, we do not face the factual question of whether or not the hospital was suffi-ciently associated with the church to qualify for the exemp-tion. It is undisputed that the hospital is a church-affiliated organization and not a church. The only question, therefore, is whether it can establish a church-plan in the first instance.

Likewise, the district courts that have concluded that the exemption can apply to plans established by church-affiliated organizations (rather than by churches) fail to make sense of the interplay between subsections (33)(A) and (33)(C)(i). *See, e.g., Medina*, 2014 WL 4244012, at *2. (dismiss-

ing the distinction between "established and maintained" as a "term of art"); *Overall*, 23 F. Supp. 3d at 829 (interpreting the word "includes" in subsection (33)(C)(i) in a manner that eviscerates the substance of subsection (33)(A)).

Loyalty to the plain language principle is particularly important in this case. Advocate wishes to push the meaning of the exemption to include more organizations, and many more at that—organizations not contemplated by the primary definition in subsection (33)(A). ERISA, however, was written to protect workers who have invested their retirement savings into employer-run financial plans. And because it "is a 'remedial' statute [it] should be 'liberally construed in favor of protecting the participants in employee benefit plans.'" *Kaplan*, 810 F.3d at 182 (*citing IUE AFL–CIO Pension Fund v. Barker & Williamson, Inc.*, 788 F.2d 118, 127 (3d Cir. 1986)); *see also John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 97 (1993) (while discussing an ERISA exemption, noting that courts are "inclined, generally to tight reading[s] of exemptions from comprehensive schemes of this kind.").

Employees of religiously-affiliated hospitals are not immune from the perils of unregulated pension plans. The *amici* briefs in support of the defendant-appellants are replete with examples of hospitals that, after receiving a letter ruling from the IRS finding that the hospital's pension plan qualified as a church plan, converted their plans into ones not governed by the protections of ERISA. Then, when those hospitals encountered financial trouble, their employees were left with severely underfunded and uninsured pension plans. And, like the plan here, because no church had established those hospitals plans, there was no church to accept

responsibility for the fate of the participants' retirement benefits. *See Amicus Curiae* Brief of the Pension Rights Center in Support of Plaintiff-Appellee and Affirmance, p. 11; Brief of *Amici Curiae* Americans United for Separation of Church and State, American Civil Liberties Union, and ACLU of Illinois in Support of Appellees and Affirmance, pp. 9-10. *See also* Brief *Amici Curiae* of AARP and the National Employment Lawyers Association (NELA) in Support of Appellees Urging Affirmance, pp. 12-20 (cataloguing the many ways that church plans create serious financial risks for employees).

One need not impute a nefarious motive to the administrators of these plans in order to recognize the import of the ERISA protections. Even those plan administrators with the best of intentions may lack financial acumen or simply have bad investment luck. ERISA, however, would protect plan participants from these unintentional harms too.

### B.

Our conclusion that the text is not ambiguous makes resort to statutory history unnecessary. *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1709 (2012). Nevertheless, to the extent that legislative history is relevant to statutory interpretation, as the district court stated, the legislative history supports the correctness of the straightforward, rather than expansive reading of subsections (33)(A) and (33)(C) of Section 1002 of ERISA. D. Ct. Order at 15 (R. 64, p.15). The limited scope of the church-plan exemption can be gleaned from the plain language of the text, but the legislative history may be considered "to the extent [it] sheds a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S.

546, 568 (2005). In this case, the legislative history sheds reliable and helpful light.

As we have explained, the initial version of the language in ERISA subsection (33)(A), enacted in 1974, exempted plans created and maintained by churches so as to avoid any potential entanglement issues between the government and the churches. S. Rep. No. 93-383 (1973), reprinted in 1974 U.S.C.C.A.N. 4889, 4965 (exempting church plans to avoid "examinations of books and records" that "might be regarded as an unjustified invasion of the confidential relationship … with regard to churches and their religious activities.") The 1974 legislation permitted pre-existing plans established and maintained by churches to cover employees of church-affiliated agencies, but only temporarily. That provision was set to expire at the end of 1982. 29 U.S.C. §§ 1002(33)(A), (33)(C) (1974). *See* PL 93-406, § 3, 88 Stat. 829 (Sept. 2, 1974). The religious community had two distinct concerns about the 1974 definitions: (1) The sunset provision would preclude church plans from including employees of church-affiliated agencies after 1982 and therefore create a situation in which a church would be required to have one exempt plan for church employees and a separate non-exempt plan for the church-affiliated employer (the affiliated entity problem); and (2) the requirement that all church plans be "maintained" by a church concerned certain churches that used distinct financial services organizations, which were separate from but controlled by the denomination, to maintain and administer their pension plans (the pension board problem). To address these concerns, Senator Herman Talmadge and Representative Barber Conable co-sponsored amendments to the church plan definition, which were enacted as part of the Multiemployer Pension Plan

Amendments Act of 1980, Pub. L. No. 96-364, 94 Stat. 1208 (Sept. 26, 1980). This 1980 amendment remains current law.

To address the pension board problem—that is, what types of entities could maintain a church plan—the legislators proposed and Congress adopted language that amended the meaning of "a plan established and maintained … by a church" to "include [] a plan *maintained* by an organization … the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both … if such organization is controlled or associated with a church." Id. at § 407 (emphasis supplied). Thus a church-established plan could be maintained by either a church or a church affiliated "principal purpose" entity, such as a pension board.

The original proposed version of subsection (C)(i) expanded the church plan exemption to "include" plans "*established and* maintained" by "principal purpose" entities. 124 Cong. Rec. 12,107 (May 2, 1978) (statement of Rep. Conable). This would have allowed a pension board (or possibly other affiliated organizations) to establish a church plan on its own. The final version, however, omitted the words, "established and," before the word "maintained" when discussing the church-affiliated entities, thus purposefully leaving within the exemption only those plans established by a church. This critical difference between the final text and earlier drafts of the 1980 amendment supports the theory that the narrow language was intentional. "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *Russello v. U.S.*, 464 U.S. 16, 23-24 (1983).

In other words, the additional language added in subsection (33)(C)(i) resolved the logistical problem that many churches faced when they wanted to establish church plans but were not necessarily interested in or qualified to administer those plans themselves and therefore wished to engage a third party to administer or maintain the plan. Viewed in this context, Congress's purposeful choice to limit the wording of subsection (33)(C)(i) to plans maintained by eligible organizations makes logical sense and its omission of those established by such entities appears deliberate.

The legislative comments support the notion that the legislature had no intention of altering the original definition of a church plan as one established and maintained by a church. When introducing the legislation, Senator Talmadge stated that the amendment would "retain the definition of church plan as a plan established and maintained for its employees by a church" but would clarify that "a plan or program funded or administered through a pension board … will be considered a church plan." 124 Cong. Rec. S.3172, 16,523 (1973) (Sen. Talmadge). And various committee reports emphasized that the language was added merely to clarify that a church plan could be maintained by a pension board. *See Rollins*, 19 F. Supp. 2d at 917 (collecting committee comments demonstrating that it was the intention of Congress to maintain the original definition of a church plan and simply clarify that pension boards could maintain those church-established plans). In sum, the history explains that the purpose behind subsection (33)(C) was to permit churches to delegate the administration of their retirement plans, not to broaden the scope of who could establish those plans. *See id.* at 916.

To address the affiliated agency problem, the legislators proposed language that amended the definition of "employee" to "include[] … an employee of an organization … which is controlled by or associated with a church." 29 U.S.C. § 1002 (33)(C)(ii)(II). The result was that a church plan—which is still defined as a "plan established and maintained … for its employees by a church," (§ 1002 (33)(A)), could now include employees of church-associated organizations indefinitely. This addressed concerns that churches would have to create two separate plans—one for churches themselves and another for church-affiliated agencies—and addressed concerns about treating religious clergy and lay employees differently, or the difficulties that might ensue when clergy move from job duties in a church to those in an affiliated agency and back again. Thus subsection (33)(C)(ii)(II) allowed churches to include both their church employees and their affiliated-organization employees in the same ERISA-exempt plan, but otherwise "retained the basic definition of church plan as a plan established and maintained for its employees by a church." 124 Cong. Rec. 12107 (May 2, 1978) (Rep. Conable). As Senator Talmadge explained, "[u]nder the provisions of our proposals, … a church plan shall be able to continue to cover the employees of church-associated organizations. There will be no need to separate the employees of church agencies from the church plan." 125 Cong. Rec. 10,052 (May 7, 1979) (Sen. Talmadge).

Advocate and the *amici* supporting it draw our attention to the commentary leading up to the amendments in which legislators and representatives of many religious institutions explained how church-affiliated organizations performed roles important to the functions of the church. For example, Senator Talmadge stated, "Church agencies are essential to

the church's mission. They care for the sick and needy and disseminate religious instruction. They are, in fact, part of churches." 125 Cong. Rec. 10,052 (May 7, 1979) (Sen. Talmadge). This language surely conveys why some legislators thought it important to continue to allow employees of church-affiliated organizations to be included in the same plans as the church, but it does nothing to support a theory that such organizations should be allowed to establish their own church plans. *See Kaplan*, 810 F.3d at 184 (clarifying that Senator Talmadge's language regarding the importance of church-affiliated organizations was focused on correcting the sunset provision for affiliated-agencies and was not meant to allow those agencies to establish church plans).

In sum, although the legislative record clearly supports an intent to continue to allow employees of church-affiliated organizations to be included in church plans, no part of that record suggests an intent to allow a church-affiliated corporation to claim the exemption for a plan unless the church itself has established the plan, as required by the original definition of a church plan in subsection (33)(A) of ERISA.

The final piece of Advocate's statutory argument focuses on a treasury regulation. Advocate argues that the addition of the amended ERISA statutory language rendered the following treasury regulation redundant: "a plan which otherwise meets the provisions of this section shall not lose its status as a church plan because of the fact that it is administered by a separately incorporated fiduciary such as a pension board or a bank." 26 C.F.R. § 1.414(e)-1. It is true that the statute is duplicative, but although courts have long recognized that a statute should not be construed to render other statutory words or phrases redundant, it has never been

the rule that a regulation cannot be redundant with a statute. *See, e.g., Linares Huarcaya v. Mukasey*, 550 F.3d 224, 229-30 (2d Cir. 2008) ("it is unclear whether the statutory principle not to render a term redundant even applies to deference to an agency regulation.")

In sum, Advocate's arguments regarding the legislative history and purpose of the ERISA amendments focus on the fact that many church-affiliated organizations carry on the work of the church (to care for the sick and needy, for example) and are thus integral to the mission and purpose of the church. Neither the plaintiffs nor the court below, nor this court quarrel with this view. Because of this shared mission, Advocate argues, church-affiliated-organization employees ought to be allowed to participate in the church's retirement plan. And indeed they are. The ERISA exemption does not hinder a church's ability to include its affiliated-organization employees in its plan in any regard. Church-affiliated-organization employees may participate in the same retirement plans as church employees with no further distinctions. Moreover, churches may have outside organizations maintain their plans. The only requirement is that a church must establish the plan in the first place.

## C.

Advocate also asks this court to give deference to the IRS interpretation of a church plan. After Congress passed the ERISA amendments, the IRS began distributing letter rulings in which it issued ERISA exemptions to plans established by church-affiliated organizations. *See* R.74-2, pp. 8-31 (collecting IRS private ruling letters). The IRS issued both of Advocate's predecessor hospitals a private letter ruling (on March 7, 1991 to Evangelical Association Employees' Pension Plan

(R.35-11) and on November 3, 1998, to the Lutheran General Plan (R.35-12). Advocate merged these two plans into the existing plan on December 31, 1998. It is tempting indeed to turn to the interpretation made by the agency charged with administering these tax exemptions to settle this dispute, but we can do so only when the opinions of that agency are expressed after a "formal adjudication or notice and comment rulemaking." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). A court does not owe the same deference to an agency opinion expressed in a letter that it would to an agency interpretation that emerges through formal processes. *Id.* Indeed, even the 1982 IRS General Counsel Memorandum that Advocate cites states, "This document is not to be relied upon or otherwise cited as precedent by taxpayers." 1983 WL 197946, at *6 (Nov. 2, 1982). "[I]nterpretations contained in formats such as opinion letters are 'entitled to respect,' … but only to the extent that those interpretations have the 'power to persuade.'" *Christensen*, 529 U.S. at 587 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). In this case, the IRS position came in a general counsel memorandum and through individual letter rulings and not through formal adjudication and rulemaking. *See Christensen*, 529 U.S. at 587. Moreover, the general counsel memorandum also conflicts with the plain language of the statute and wholly fails to consider the relationship between definitions of a church plan in subsections (33)(A) and (33)(C)(ii).

The fact that the IRS private letter rulings have been "long standing" and abundant does not alter our conclusion. Congressional acquiescence to an agency's statutory construction may be inferred only where there is "overwhelming evidence that Congress considered and failed to act upon the precise issue before the court." *Rapanos v. U.S.*, 547 U.S.

715, 750 (2006) (internal citation omitted). "Congressional silence lacks persuasive significance … particularly where administrative regulations are inconsistent with the controlling statute." *Brown v. Gardner*, 513 U.S. 115, 121 (1994) (internal citations omitted). There is no evidence that Congress was aware of the agency's interpretation and acquiesced. We conclude, therefore, as did the district court, that the IRS letter rulings are not persuasive and we owe them no deference.

## D.

Each party also makes a claim under the First Amendment. Advocate alleges that by finding that only a church can establish a plan, the district court has construed the statute in a way that allows the government to define what a church is and how it should structure its mission. The plaintiffs (buttressed by *Amicus Curiae* Freedom From Religion Foundation) assert that any exemption at all for church plans violates the Constitution by favoring religious adherents over non-adherents. *See Bd. of Educ. v. Grumet*, 512 U.S. 687, 696 (1994). We need not address the plaintiffs' Constitutional argument, as our interpretation of the statute provides the plaintiffs with all of the relief they request.

The problem with Advocate's constitutional claim—that the government's interpretation allows the government to define what is and is not a church—is that it equally dooms Advocate's own interpretation of the statute. In order for a church-affiliated organization to take advantage of the exemption, the government must still determine whether the entity with which that organization is claiming affiliation is indeed a church. And in determining whether that allegedly affiliated organization is indeed sufficiently associated with

the church, the courts invariably dig deeply through the workings of the church and its relationships with the affiliated agency. *See, e.g., Lown*, 238 F.3d at 548; *Chronister v. Baptist Health,* 442 F.3d 648, 653 (8th Cir. 2006); *Thorkelson*, 764 F. Supp. 2d at 1127; *Catholic Charities of Maine,* 304 F. Supp. 2d at 85; *Goetz v. Greater Georgia Life Ins. Co.,* 554 F. Supp. 2d 831 (E.D. Tenn. 2008).

In any event, Congress has made these distinctions on numerous occasions before, distinguishing between churches and other religious organizations without constitutional concern. *See Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 672-73 (1970) (upholding the constitutionality of a property tax exemption for churches); *U.S. v. Jeffries*, 854 F.2d 254, 258 (7th Cir. 1988) (applying criteria to distinguish a church from other forms of religious enterprise); *Found. of Human Understanding v. U.S.*, 614 F.3d 1383, 1389 (Fed. Cir. 2010) (noting, the "generally accepted principle" that Congress may distinguish between churches and other religious organizations). Indeed the U.S. Code is filled with provisions that distinguish between churches and other religious entities. *See, e.g.*, 26 U.S.C. § 7611 (restricting IRS inquiries into a church or "convention or association of churches," but not into other religious entities); 26 U.S.C. § 170(b)(1)(A)(i) (allowing deductions for charitable contributions to churches); 26 U.S.C. § 514(b)(3)(E) (applying special rules for debt-financed properties when those properties belong to a church). In short, "religious employers … have long enjoyed advantages (notably tax advantages) over other entities … without these advantages being thought to violate the establishment clause. *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 560 (7th Cir. 2014) *cert. granted, judgment vacated on other*

*grounds sub nom. Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015).

Advocate argues that our interpretation results in church plan status being based on a church's structure and governance and that it discriminates against denominations. It is true that one religious denomination cannot be preferred over another. *Larson v. Valente*, 456 U.S. 228, 244 (1982). But "[t]he establishment clause does not require the government to equalize the burdens (or the benefits) that laws of general applicability impose on religious institutions. *Sebelius*, 743 F.3d at 560. And so, for example, "[a] law exempting churches or other religious property from property taxes will benefit religious denominations that own a great deal of property, to the disadvantage of denominations with modest property holdings (such as storefront churches). This unequal effect does not condemn the law." *Id*. In fact, it is not so much the structure of the church as the structure of the church-affiliated organization that matters here. Any church that establishes a plan can claim shelter within the ERISA exemption no matter what religion, structure or denomination. That plan can be maintained by the church itself or maintained by a pension board or other outside organization. A church can also establish a church plan for any of its affiliated organizations no matter what the religion or denomination, and that plan can be maintained by the church itself or maintained by a pension board or other outside organization. The church plan definition is available to all churches of all religious denominations and structures.

Because we have concluded that Advocate's benefit plan does not meet the definition of an ERISA church-plan ex-

emption, we need not resolve any of Advocate's remaining issues. The opinion of the district court is AFFIRMED.

KANNE, *Circuit Judge*, concurring. Because I am persuaded that our interpretation of this statute does not compel church-affiliated organizations to operate in a way that violates their religious beliefs, I join the majority opinion in full. At bottom, this statute requires a church-affiliated organization to use a particular corporate form for its retirement plans in order to receive the benefit of being exempt from ERISA. I have doubts there is a constitutional or statutory right to a retirement plan using a particular corporate structure. *See Kaplan v. Saint Peter's Healthcare Sys.*, 810 F.3d 175, 186 (3d Cir. 2015).

I am aware, however, of religious concerns that have arisen from other statutes compelling entities to provide services that violate their religious beliefs. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 626 (7th Cir. 2015) (Flaum, J., dissenting). I write separately to emphasize that this is not one of those cases. For that reason, I am comfortable joining in the majority's well-reasoned opinion.